## STATE, RESPONDENT, *v.* BROOKS, APPELLANT.

[No. 1,413.]

[Submitted July 3, 1899. Decided July 13, 1899.]

*Criminal Law — Homicide — Insanity— Character—Evidence Instructions—Burden of Proof—New Trial—Conduct of Jury.*

1. Where there is no evidence showing that a defendant charged with murder was insane, evidence of his declarations and conduct is inadmissible to prove insanity, unless the purpose of such evidence is disclosed.

2. Evidence that a defendant had preached in a church at divers times is inadmissible to prove his good character.

3. On a murder trial, where instructions upon the law of justifiable homicide are unnecessary, it is not error, that defendant can complain of, to give such instructions.

4. Where evidence proved murder in the first degree, an instruction that, to make the killing manslaughter, it must be done "upon the instant,—that is, at the time the provocation is given, and under the influence of it, before the blood has had time to cool, and before the mind has had time to consider the character and gravity of the act about to be done, and not from hatred or pre-existing revenge," is not prejudicial to defendant.

5. It is not error to instruct the jury that a homicide would not be manslaughter if committed in an unreasonable fit of passion.

6. An instruction that, "if defendant was so far in possession of his mental faculties as to be capable of knowing that the act of killing was wrong, any mental defect which

might cause him to more readily give way to passion than a man ordinarily reasonable could not be considered," is not prejudicial to a defendant who claimed to be insane and was convicted of murder in the first degree.

7. A new trial will not be granted for newly discovered evidence which is cumulative merely.

8. Where jurors in a capital case agreed upon a verdict of guilty on the third ballot, to which all agreed, when polled, it will not be set aside because one of them stated in the jury room, before the informal ballot was taken, that he was "willing a majority should rule."

9. On a trial for murder, it is proper to charge "that, upon proof of the commission of the homicide by the defendant, the burden of proving circumstances of mitigation or excuse devolves upon him, unless the proof on the part of the prosecution tends to show that the crime only amounts to manslaughter, or that he was excusable," under Penal Code. Section 2081, regulating the burden of proof in such cases.

10. It is not error to refuse to instruct. in a murder case, that defendant should be acquitted if a fair preponderance of evidence shows his insanity; the correct rule being that he is entitled to an acquittal where the evidence' raises a reasonable doubt of his sanity when the crime was committed.

*Appeal from District Court, Yellowstone County; C. H. Loud, Judge.*

DEFENDANT, William C. Brooks, was convicted of murder in the first degree, and he appeals. Affirmed.

*Mr. Charles L. Harris,* for Appellant.

The court's action and ruling regarding the admission of evidence was clearly erroneous under the following authorities: *State* v. *Mewherter,* 46 Ia. 88; *State* v. *Hays,* 22 La. Ann. 39; *State* v. *Kelly,* 57 N. H. 549; *State* v. *Bauerman* (Kas.), 53 Pac. Rep. 874; *State* v. *Brooks,* 4 Wash. 328; *State* v. *Hurst* (Idaho), 39 Pac. Rep. 554; *People* v. *W. Wreden,* 59 Cal. 392; *People* v. *Sanford,* 43 Cal. 29; *State* v. *Erb,* 74 Mo., 199; *State* v. *Baldwin,* 12 Mo. 223.

The trial court erred in the instructions given, and for this reason the case should be reversed under the following authorities: *State* v. *Rolla,* 21 Mont. 582, 56 Pac. 523; *State* v. *Sloan,* 22 Mont. 293, 56 Pac. 364; Bishop's Crim. Law, Vol. II, Secs. 697, 712, 713.

*Mr. C. B. Nolan, Attorney General,* for the State.

The affidavits in support of the ground of newly discovered evidence cannot be considered for the purposes designed. There does not appear in a single affidavit presented a fact or

circumstance or occurrence which would warrant the deduction that the defendant was insane. Instead of giving the conclusion of the affiant that the defendant in his judgment was insane, it was incumbent upon him to set forth the acts or conduct of the defendant which occasioned the belief on the part of the affiant that the defendant was mentally unbalanced. It is a settled law in this state that nonprofessional witnesses who are acquainted with the defendant, and have observed his actions and manner of life, may give in evidence their opinions as to his sanity or insanity on a trial for murder. Before this opinion is admissible it is essential that the facts upon which it is predicated must be submitted. (*Territory* v. *Hart*, 7 Mont. 489; see, also, *State* v. *Bauerman*, 53 Pac. Rep. 874; *Baughman* v. *Baughman*, 32 Kan. 538; *Carpenter* v. *Hatch*, 64 N. H. 573; *Insurance Co.* v. *Lathrop*, 111 U. S. 612; *State of Washington* v. *C. Brooks*, 4 Wash. 328; *State* v. *Erb*, 74 Mo. 199; *State* v. *Klinger*, 46 Mo. 229; Bishop, New Crim. Pro. Vol. II, Sec. 678.) The affidavits failing to disclose facts upon which an opinion is based must be disregarded.

Assuming that the affidavits are sufficient in form, is the newly discovered evidence sufficient to warrant a new trial? Thompson in his work on trials, Section 2762, discusses what is essential when application is made for new trial on the ground of newly discovered evidence. He says that the affidavit should state:

1. That the applicant has been vigilant in preparing his cause for trial. (2.) That new and material facts have been discovered since the trial, which could not by reasonable diligence have been produced at the trial; stating what the evidence is. (3.) That such evidence will tend to prove facts, which were not directly in issue on the former trial, or were not then known or investigated by proof, or that it will produce a different result at a second trial. (4.) Such affidavits should give the name or names of the witness or witnesses, by whom such facts can be proved.

The affidavits tested by this standard are wholly insufficient. The evidence at best is cumulative, no reasonable ex-

cuse is offered why the evidence could not be secured upon a
former trial, and it does not appear that if a new trial were
granted a result different from that obtained would be se-
cured. Newly discovered evidence is tolerated rather than
favored because of its liability to abuse and its tendency to
mislead. (*Erskine & Co.* v. *Duffy*, 76 Ga. 103.) As to the
insufficiency of the showing made, reference is made to the
following authorities: (*Chandler* v. *Smith*, 70 Ill. App. 658;
*Sisler* v. *Shaffer*, 43 W. Va. 769; *Albright* v. *Hannah*, 103
Ia. 98; *Turner* v. *State*, 37 Tex. Crim. Rep. 451; *Lafevre* v.
*De Brule*, 71 Ills. App. 263; *Williams* v. *The People*, 164
Ill. 481; *Newton* v. *Cook*, 33 S. W. Rep. 934; *Territory* v.
*Bryson*, 9 Mont. 33; *Harris* v. *The State*, 97 Ga. 408; *Hill-
man* v. *White*, 46 Pac. Rep. 111; *Hayne* v. *Chandler*, 99 Ga.
214; *Smith* v. *The State*, 143 Ind. 685; *Outcalt* v. *Johnson*,
9 Colo. App. 519; *Robinson* v. *The State*, 35 Tex. Crim. Rep.
19; *People* v. *Ah Ton*, 53 Cal. 741; *Lukins* v. *Garrett*, 2
Kan. App. 722; *Brown* v. *Mitchell*, 102 N. C. 347; *Wis. Cen.
R. R.* v. *Ross*, 142 Ill. 11; *People* v. *Baker*, 50 N. Y. Sup.
771; *State* v. *Davis*, 53 Pac. Rep. 678; *Wright* v. *Southern
Express Co.*, 80 Fed. 85; *Flint & P. M. R. R. Co.* v. *Marine
Ins. Co.*, 71 Fed. 310; *People* v. *Goldenson*, 76 Cal. 330;
*Madison Coal Co.* v. *Beam*, 63 Ill. App. 179; *McLeod* v.
*Shelby Mfg. & Imp. Co.*, 108 Ala. 81; *Ill. Cent. R. R. Co.*
v. *Truesdell*, 68 Ill. App. 324; *Cropper* v. *The City of Mexico*,
62 Mo. App. 385; *Linscott* v. *Orient Ins. Co.*, 88 Me. 497;
*Reid* v. *Flanders*, 62 Ill. App. 106; *Gran* v. *Houston*, 45
Neb. 817; *O'Hara* v. *N. Y. C. & H. R. R. R. Co.*, 36 N.
Y. Sup. 67; *Robinson* v. *The State*, 32 S. W. R. 900; *Rich-
ardson* v. *Huff*, 43 S. W. Rep. 464; *Conlan* v. *Mead*, 172
Ill. 13; *Stewart* v. *Pattengall*, 91 Me. 173; *Bradley* v. *Nor-
ris*, 67 Minn. 48; *Norfolk* v. *Johnakin*, 94 Va. 285; *Fall* v.
*Chapman*, 56 Mo. App. 581; *Hammond* v. *Phillips*, 89 Mo.
70; *Lewis* v. *Newton*, 67 N. W. Rep. 724; *State* v. *Lane*, 44
W. Va. 730; *Sullivan* v. *The State*, 101 Ga. 800; *Sayer* v.
*King*, 47 N. Y. Sup. 422; *State* v. *Rohrer*, 34 Kan. 427;
Bishop's New Crim. Pro. Section 1279.)

**MR. JUSTICE HUNT** delivered the opinion of the Court.

Defendant, William C. Brooks, was convicted of murder in the first degree, for the killing of Jennie Brooks. He appeals from the judgment sentencing him to death, and from the order of the district court denying his motion for a new trial.

The evidence of the state disclosed these material facts: Jennie Brooks was the wife of the defendant. The couple had not lived together for some time. On November 18, 1898, between 4 and 5 o'clock in the afternoon, a cry of murder was heard in the neighborhood where Mrs. Brooks lived. Defendant was seen running, at the time this cry was heard, across the street, after his wife; he fired a shot as he got to the gate of the house in which she lived, and followed the woman until they reached the middle of the street, where she stopped, and they had a scuffle, in which she was down on her knees part of the time, reaching out in the direction of the defendant's hand. While in this position he pushed her back and got away from her, and fired another shot at her, asking her if she was shot. She said something in a low tone, then ran away from him and fell dead. The defendant then fired several shots, apparently at himself, and, after doing this, went up to the body of his wife, lying on the face, close to the house, reached over and looked at it, took the revolver, put it down to her ear and fired, saying, "Now you are dead." Defendant then said he would go and give himself up, and again said, "No, I wont; I'll just shoot myself,"—and again shot the revolver off, but, as he did so, dodged his head to the side and avoided the bullets. Defendant then told the officers to come and take him, and said he would give himself up and did so. Mrs. Brooks had no weapon. Defendant, after the shooting, told a witness that it was unnecessary to go through any preliminaries; that they could just take him out and hang him, as he was ready to die,—and handed a bunch of keys to witness, telling him that they were the keys to his place of business, and he desired that his things should be taken and sold.

A boy named Charley Powers, who lived with Mrs. Brooks, testified that, just before the shooting, Brooks went to Mrs. Brooks' house and was standing there, holding the bill of a little live black pigeon in his mouth. Brooks at that time asked his wife what men had been doing about the house about 1 o'clock on Tuesday or Wednesday night. Mrs. Brooks denied that there had been any men about there at that time, and thereupon the defendant called her a "big whore," threatened to kill her and struck at her. She then struck him with a small stick, and then they had a scuffle in which Brooks knocked her down and shot off his pistol, but missed her. This was just before the occurrences out of doors when she was killed.

The substance of the testimony in defendant's behalf was that he and his wife had quarreled a great deal, and that the seperation just before the killing was at least the third that had occured between them. They had had a quarrel on the evening of November 14th. Defendant himself did not go on the witness stand, and relied upon insanity as a defense. To sustain this plea he called a witness named Scott, who testified: That he had known defendant for about four years. That he had never paid much attention to the actions, speech, appearance, and peculiarities of the defendant, but that on one day defendant called witness, and wanted him to rent a church "down there." Witness told him, "Yes;" that, if they rented it out in the winter, they could make money enough out of it to fix it up; that the rental was to be six dollars a month. That defendant went off to fix up the contract, and when he returned, "he had it fixed up for six dollars for six months. So I told him: 'You must be out of your head. A man that would have sense would know better than that.'" Witness said he did not think that he noticed anything peculiar in defendant's action just prior to the homicide; that the defendant was a trustee of the African Church, and a member thereof. This witness was recalled, and gave the following testimony in support of the defendant's plea of insanity: "I testified here this morning that I was present at the colored

church in Billings about the month of September, 1898, at which time there was a disturbance came up in the church, and in which Mr. Brooks was one of the parties engaged. After the preaching was over, they had a minister here, and he wanted to collect some money to fix up the church; and Mr. Brooks drawed out a paper there, and proceeded to the altar to collect some dollar money and Sunday school money to represent our church, and I told him that it wasn't necessary to do that, 'cause we had no church, we simply had the building there, and we had no means, and it was no use to send any money away until we got straight on our feet here. At that time Brooks got excited, you know, because he had everybody up telling him to behave and sit down, or else go home,—one of the two. In regard to his actions he was like any one else, I suppose,—when he would get angry or mad he looked like he was crazy. I couldn't reason with him. I went to his home afterwards and tried to reason with him, but I couldn't do it. This was about an hour after the disturbance that occured at the church. He would not listen at that time to us at all. When he gets mad he is excited. He was mad that night. He seemed to want to be the leader of our church, and he also wants to be the leader of the colored people of this town. At that time I did not think him crazy. He was excited and strong-headed, and you could not reason with him."

Dr. J. H. Rinehart testified as an expert on insanity. Defendant's counsel put a long hypothetical question to him, based upon every circumstance that could have possibly been deduced from the testimony bearing at all upon the plea of insanity, and then asked him this question: "Would you say that this question contained evidences of insanity?" The doctor's reply was, substantially, that there were a great many evidences of insanity under certain circumstances, which under other circumstances would hardly pass as evidences of insanity, and that there were quite a number of things, in the proposition put, involving symptoms of insanity. It so happened that Dr. Rinehart was a witness of the homicide itself,

and saw everything that occurred after the defendant and his wife left the house. The state called him in rebuttal, and he said that he was not prepared to say whether the defendant was acting like a crazy man or not; that he was "plowing around there in a terribly excited condition," and that while he never had been well enough acquainted with him to form any opinion as to his sanity at that time, yet he had no reason to think that he was insane, from his actions, because he was not intimately enough acquainted with him to decide whether he was or not; that he always considered him a sane man, from what he knew of him, and had no reason to think for a moment that he was insane.

Another witness, who had known the defendant for four or five years, and had seen him frequently, testified on rebuttal that he would say that defendant was a sane man, and that at the time of the killing the thought never entered his head that Brooks was insane.

1. A witness for the defense, who testified that defendant and his wife quarreled a great deal, was asked if defendant ever stated to him anything in relation to his domestic troubles. Objection was made on the ground that this was hearsay testimony, and the court sustained the objection, defendant preserving his exception. We see no error in the ruling of the court. The witness to whom this question was put was the first called by the defendant. It was not stated to the court that the object of the question was to disclose the insanity of the defendant, nor had there been any offer of proof to that effect up to that time. The revelancy or materiality of the question did not appear by the question itself,— on the contrary, it appeared to call for incompetent testimony, and the court correctly sustained the objection at the time of the ruling.

2. The court declined to permit another witness for defendant to be asked if defendant ever delivered any discourses in the African Church. The object of this question defendant's counsel stated to be to show that defendant "was a devoted Christian." We think that the court properly excluded this

testimony. Defendant had a right to put his character in issue, but it was not competent to prove good character by showing that defendant had preached at divers times. If the object was to show insanity, that object was not disclosed by the question or statement of counsel.

3. The same witness was asked what, if anything, defendant had said to him on the streets of Billings at half past 1 o'clock on the day of the homicide. This was excluded, and we think properly so, upon the ground that it apparently called for hearsay testimony in defendant's behalf. If its purpose was to show insanity, such purpose should have been disclosed.

4. Josephine Samples, called by defendant, after testifying that Brooks and his wife quarreled a great deal, was asked if she knew whether or not defendant ever charged his wife with infidelity. The court sustained an objection to this question, and the witness was not allowed to answer. Counsel for defendant did not state to the court that the object of this question was to prove the issue of insanity of the defendant, nor was the question put to the witness as if with the object of eliciting evidence that the defendant was insane when he killed his wife. Under the circumstances, therefore, we do not see how it became material; but, assuming it was a proper question upon any other issue, no harm could have resulted to defendant, because it appears by the testimony of witnesses for the prosecution, and it was not denied, that the defendant called his wife a "whore" a few minutes before he killed her, and had asked her who the men were that had been in her house at midnight on several evenings before the day of the killing. Thus evidence of an assertion of the infidelity of his wife, and accusations of such infidelity, were before the jury, and were afterwards embraced in a hypothetical question put to a physician called by defendant as an expert on insanity.

But, up to the point of the ruling just adverted to, no witness had testified that in his opinion defendant was of unsound mind; nor had defendant's counsel stated that the object of

his interrogatories was to prove insanity. · While it is clearly the right of a man charged with crime to plead insanity as a defense, and in support thereof to introduce evidence to prove conduct and speech showing a diseased mental condition, still the presumption of sanity cannot be overcome by the introduction of testimony wholly incompetent and irrelevant upon any issue except that of insanity, without first making it appear to the court, in an offer of proof or statement of counsel that the purpose of such testimony is to rebut the legal presumption of sanity which goes with the state's *prima facie* case of guilt.

5. The court committed no error in instructing upon the law of justifiable and excusable homicide. Not to have done so would not have been error in this case, but in doing so the court only gave to the jury the clearest understanding of the various kinds of homicide recognized by the law. We cannot see how this course could have confused the jury, or been otherwise than favorable to defendant; for it allowed the jury to consider defenses, which, if sustained on any theory, would have been greatly to defendant's advantage.

6. Defendant complains of the following instruction:

"If you find that defendant is guilty of an unlawful homicide, but that the killing was done without malice aforethought, then the defendant would be guilty of the crime of manslaughter as defined in these instructions; and in this connection you are instructed that 'heat of passion,' as used in that definition and in these instructions, means a condition of quick anger or sudden injury engendered by some real or supposed grievance suffered at the time, and amounting to a temporary dethronement of reason, which must be sufficient to rouse an irresistible and uncontrollable passion in a reasonable person; and, in order to reduce an unlawful homicide from murder to manslaughter, the killing must be done upon the instant,—that is, at the time the provocation is given, and under the influence of it, before the blood has had time to cool, and before the mind has had time to consider the character and gravity of the act about to be done, and not from

hatred or pre-existing revenge. And you are instructed that no provocation by words only, however opprobrious or threatening, will mitigate an intentional homicide so as to reduce it to manslaughter. And it cannot be urged that the homicide was manslaughter if you find it was committed in an unreasonable fit of passion. The law makes the offense manslaughter when it is committed under the influence of passion caused by an insult or provocation sufficient to excite an irresistible passion in a reasonable person. If the defendant was so far in possession of his mental faculties as to be capable of knowing that the act of killing was wrong, any mental defect which might cause him to more readily give way to passion than a man ordinarily reasonable cannot be considered by you in this connection. To reduce the offense to manslaughter, the provocation must at least be such as would stir the resentment of a reasonable man.''

Part of this instruction is not to be approved of. It is not a very clear definition of heat of passion. (*State* v. *Sloan*, 22 Mont. 293, 56 Pac. 364.) But in many respects the other portions state rules of law applicable generally to fundamental distinctions between manslaughter and murder. Particular objection is urged to the use of the language which told the jury that, to make the killing manslaughter, it must be done "upon the instant,—that is, at the time the provocation is given, and under the influences of it, before the blood has had time to cool, and before the mind has had time to consider the character and gravity of the act about to be done, and not from hatred or pre-existing revenge.'' The criticism that this language makes the instruction ambiguous is not well founded. There can be no reasonable misunderstanding of the principle announced by it,—that if a man is so aroused by a sufficient provocation, real or supposed, as to temporarily take away his reason, and he acts under the impulsive influence of the moment by killing a fellow being, he will not be held to account for murder, but that if there is an intervening time, in which his blood may cool, and the mind has had time to consider the fact that he is about to kill a man, and he acts by

killing from hatred and out of revenge, he will be accounted guilty of murder, and not of manslaughter. We believe that to be the correct principle.

It is also said that it was error to say that the homicide would not be manslaughter if it was committed in an unreasonable fit of passion. Nor would it be. If, for example, a man, without provocation of any kind, works himself into a fit of passion over a most trivial affair of life, and in which he does not lose control of his reason, and kills another while in such condition of mind, it is an unreasonable fit of passion, and will not be sufficient to relieve him of guilt of murder. An unreasonable fit of passion is not such a one as a reasonable man under like circumstances would fall into or act under,—it is a condition of anger or passion without reason, whether real or believed to be real, for its existence. Such mental condition has but a remote relation to insanity, which confers irresponsibility; for it is too plain, generally, and was made plain by the instructions in this case, that if the defendant was insane (that is, incapable of distinguishing between right and wrong at the time of, and with respect to, the act which is the subject of inquiry), and if he killed his wife while under an uncontrollable impulse which overrode reason and judgment, or obliterated the sense of right and wrong as to the killing, and deprived the defendant of the power of choosing between them, he was not legally responsible, and must be acquitted. But the impulse of a heat of passion should not be confounded with a generally diseased mind,—the one reduces the grade of crime, thus presupposing some responsibility, while the other presupposes mental incapacity, which exempts the sufferer from criminal punishment altogether. The use of the expression "dethronement of reason," characterizing the mental condition necessary to be found in order that "heat of passion" exists, if taken by itself, might have been too severe a standard by which to distinguish between murder and manslaughter. (Clarke on Criminal Law, p. 167.) Nor is it necessary to extend the discussion into the somewhat refined distinction of the law of insanity which recognizes that

a man may be impelled by some sort of irresistible power to kill another, knowing what he is doing, and knowing that it is wrong, and of the consequences of the act; for there was no evidence tending to prove that this defendant was in such a condition of mind when he killed his wife. Reverting, then, to the instruction, it is our opinion that the clause which stated that the temporary dethronement of reason must be sufficient to rouse an irresistible and uncontrollable passion in a reasonable person was a qualifying one, specifying the extent to which the dethronement of reason needs only go, and so did away with the possibility of the jury's believing that insanity amounting to a total dethronement of reason must exist, to constitute heat of passion.

Again, the court emphasizes its meaning by subsequently repeating that the law would make the offense manslaughter if committed under the influence of passion caused by an insult or provocation sufficient to excite an irresistible passion in a reasonable person. We therefore believe that there was no misdirection to the jury which was calculated to mislead them in respect to the heat of passion.

The jury was not authorized to find that an irresistible passion might ensue from words of opprobrium, for they had been told that no provocation by words only, however opprobrious or threatening, would mitigate an intentional homicide so as to reduce it to manslaughter. Counsel's error in arguing to the contrary lies in his inattention to the rule that the instructions should be considered and construed together. "A judge is not supposed to give all the law to a jury in one paragraph or in one sentence. If, then, the whole charge, taken together, presents the law applicable to the facts of the case correctly, without contradiction or material omission, it must be held, for all practical purposes, to be correct." (*Territory* v. *Hart*, 7 Mont. 489, 17 Pac. 718.)

Objection is made to that sentence of the instruction which told the jury that, if defendant was so far in possession of his mental faculties as to be capable of knowing that the act of killing was wrong, any mental defect that might cause him to

more readily give way to passion, than a man ordinarily reasonable, could not be considered by the jury in this connection. This was, in effect, saying that though a man's mind be defective to an extent that passion easily moves him, and he gives way to it much more easily than a reasonable man ordinarily would, that fact cannot be considered, provided he was sane enough to know that the act of killing was wrong. This is generally correct, with relation to the law of manslaughter, to which it pertained, and in no respect conflicted with the duty of the jury to consider all the evidence before them offered by defendant in support of his plea of insanity, the law of which was elaborately laid down in the charge.

But under no circumstances is appellant in a position to complain of this instruction, inasmuch as he has been convicted of murder in the first degree, and inasmuch as the jury were very fully and expressly charged that, in order to find murder, they must find that malice aforethought existed, while the instruction under discussion was premised upon an hypothesis that the killing was done without malice aforethought, but in the heat of passion. They were told that the presence or absence of malice was to be determined by them in arriving at the nature of the crime, and that, if the act of killing was done with malice aforethought, it was murder; if without malice, it was manslaughter. There was no way, therefore, for them to have found murder in the first degree without first finding malice, deliberate and premeditated, in the killing; and, having found malice aforethought, deliberation upon a lesser crime, which expressly excluded the existence of malice, was immaterial, and could not have drawn them aside from the law pertinent to a malicious killing. A jury in a homicide case will generally advance with intelligence, and step by step, in the consideration of the law given them. In doing this they may go up or down the grades. If they go up, they will be apt to first determine whether the killing was lawful or unlawful, as defined by the statutes and the charge. If lawful, they will go no further; but, if they agree that it was an unlawful killing, they will move up a step, and determine

whether there was an admixture of malice or not. If this is answered "no," manslaughter is the crime to be considered. But, if the result of the deliberations that malice in the killing did exist, then that there has been murder is the conclusion of their finding, and they must follow the law bearing upon a malicious killing, and need not consider that which distinctly eliminates the element of malice, for it no longer has relevancy. Then, having taken up malice in its bearing upon the killing, they will advance to the point of deciding whether the killing was done with or without the deliberation and premeditation necessary to constitute murder in the first degree, as distinguished from murder in the second degree; and so they will move on gradually until they may reach the point where every essential of murder in the first degree is found to exist, and decide that the highest grade of the crime is necessarily established by the evidence. Throughout their deliberations in a case like this there also stands a charge upon the question of insanity, where they are told that their duty is to acquit, if they find the prisoner mentally irresponsible, no matter how shocking the homicide may have been. From all this it seems to follow as an inevitable proposition that where the jury find malice as it has been correctly defined, and where they have been clearly told what murder in its degrees is, what manslaughter is, and that they could find no murder without malice in the killing, the doctrine of error without prejudice obtains, as applied to an obscure definition of one element of the crime of manslaughter,—the heat of passion. Particularly is this true where, as in this case, the evidence proved murder, and not manslaughter. There was no room for a verdict of manslaughter. It was a killing in malice aforethought, or it was the act of an insane man. (*People* v. *O'Neal*, 67 Cal. 378, 7 Pac. 790; *State* v. *Talbott*, 73 Mo. 347; Thompson on Trials, Sec. 2403; *State* v. *Ward*, 74 Mo. 253; *State* v. *Kotovsky, Id.* 247; *State* v. *Ellis, Id.* 207; *State* v. *Erb, Id.* 199; Kerr on Homicide, p. 578.)

Finally, in the light of the full charge given upon the law of murder and manslaughter, the obscurities in the particular

charge upon an irresistible impulse and heat of passion were not prejudicial to the rights of the defendant, and the instruction complained of is not a sufficient ground for reversal of the judgment.

7. Newly discovered evidence was also a ground for asking a new trial. This point is easily disposed of by saying that the facts which defendant wished to prove by his newly discovered evidence were cumulative, tending to prove the allegation of mental incapacity which became an issue on the trial, and in support of which defendant had called witnesses who testified, and were not such as to make it clearly probable that a different result would follow another trial, nor did it appear that the testimony could not have been produced upon the former trial by the exercise of reasonable diligence. In *People* v. *Demasters*, 109 Cal. 607, 42 Pac. 236, the court well said: ''We can see no abuse of discretion on the part of the court below in denying defendant's motion for a new trial, made upon the ground of newly discovered evidence. As has been repeatedly held by this court, a motion for a new trial is addressed to the sound legal discretion of the trial court; and the action of the latter will not be disturbed, except in an instance manifesting a clear and unmistakable abuse of such discretion. This rule is peculiarly applicable to an application based upon the ground of newly discovered evidence, which not only involves an enlarged discretion in the trial court, but has never been looked upon with favor, but rather with distrust. (*Hobler* v. *Cole*, 49 Cal. 250; *Arnold* v. *Skaggs*, 35 Cal. 684.) To entitle the plaintiff to a new trial on this ground it must appear, among other things, that the new evidence be not cumulative merely; that it be such as to render a different verdict reasonably probable upon a retrial; and that the evidence could not with reasonable diligence have been discovered and produced at the trial. 1 Hayne on New Trials and Appeals, Sec. 88.''

8. Misconduct of the jury is also complained of. It appears by the affidavit of A. G. Redding, foreman of the jury: That after the jury retired he was selected as foreman,

whereupon the jury proceeded to take an informal ballot, "but that before the said ballot was taken one of the twelve jurors then and there being in the jury room suggested that 'whatever two-thirds of the vote shows, that shall be the verdict.' That this deponent demurred to the suggestion of this juror, whose name this deponent does not remember, and that affiant then and there stated 'that the verdict must be unanimous; all the jurors must agree.' After this, and before the ballot was taken, this said juror again stated 'that he was willing that a majority should rule.' That thereafter this said jury took this said informal ballot, which said ballot resulted as follows: Ten ballots for murder of the first degree, one ballot for murder of the second degree and one ballot for manslaughter. That shortly thereafter the jury took a ballot upon the merits of the case, which resulted as follows: Eleven for murder of the first degree and one ballot in these words, 'Murder degree;' and this deponent says that this said ballot was passed as no ballot, and thereafter the jury took another ballot which resulted as follows: Twelve for murder of the first degree. And further the deponent sayeth not."

Passing the proposition that, on grounds of public policy, a juror will not be allowed to impeach a verdict upon the ground stated in the affidavit quoted, we agree that the juror who said that he was willing that a majority should rule may not have had that deep sense of responsibility devolving upon him which every man ought to possess and feel when he weighs evidence and helps to determine the question of life or liberty of his fellow man. But the remark may have been mere idle speech, and presumably it was; for the jury were told that their verdict must be unanimous, and, upon a poll had after it was read in court, each answered that the verdict rendered was his true verdict. This Court cannot indulge in the presumption that a juror violated his oath to render a true verdict according to the evidence, by yielding his convictions to those of a majority of his fellows merely because they outnumbered him. Every fair presumption is

to the contrary, and we decline to hold otherwise. (*State* v. *Harper*, 101 N. C. 761, 7 S. E. 730.)

9. The court charged that upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon the defendant, unless the proof on the part of the prosecution tends to show that the crime only amounts to manslaughter, or that the defendant was justifiable or excusable. The instruction is the law as laid down by section 2081 of the Penal Code, and was proper to be given in this case. The defendant, however, ought not to complain of the refusal to instruct, in connection with this particular charge, that defendant should be acquitted if a fair preponderance of the evidence showed his insanity when the crime was committed; for the better-considered rule is that, to entitle a defendant to an acquittal on the ground of insanity, he is not required to overcome the presumption of sanity by a fair preponderance of the evidence, or any greater amount of evidence than enough to raise a reasonable doubt whether at the time of the killing he was "mentally competent to distinguish between right and wrong, or to understand the nature of the act he was committing." In the recent case of *Davis* v. *U. S.*, 160 U. S. 469, 16 Sup. Ct. 353, the supreme court review the authorities upon the question of where the "burden of proof" lies in criminal cases where insanity is relied upon as a defense, and Justice Harlan says:

"Strictly speaking, the 'burden of proof,' as those words are understood in criminal law, is never upon the accused to establish his innocence, or to disprove the facts necessary to establish the crime for which he is indicted. It is on the prosecution from the beginning to the end of the trial, and applies to every element necessary to constitute the crime. Giving to the prosecution, where the defense is insanity, the benefit in the way of proof of the presumption in favor of sanity, the vital question from the time a plea of not guilty is entered until the return of the verdict, is whether, upon all the evidence, by whatever side adduced, guilt is established beyond

reasonable doubt.    If the whole evidence, including that supplied by the presumption of sanity, does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offense charged.    His guilt cannot be said to have been proved beyond a reasonable doubt, his will and his acts cannot be held to have joined in perpetrating the murder charged, if the jury, upon all the evidence, have a reasonable doubt whether he was legally capable of committing crime, or (which is the same thing) whether he willfully, deliberately, unlawfully, and of malice aforethought took the life of the deceased.    As the crime of murder involves sufficient capacity to distinguish between right and wrong, the legal interpretation of every verdict of guilty as charged is that the jury believed from all the evidence, beyond a reasonable doubt, that the accused was guilty, and was therefore responsible criminally for his acts.    How, then, upon principle or consistently with humanity, can a verdict of guilty be properly returned, if the jury entertain a reasonable doubt as to the existence of a fact which is essential to guilt, namely, the capacity, in law, of the accused to commit that crime?"

· The learned judge sums up the discussion by approving of a part of the celebrated charge of Justice Cox in the Guiteau Case, 10 Fed. 161, where it was said:

"The crime, then, involves three elements, viz:    The killing, malice, and a responsible mind in the murderer.    But, after all the evidence is in, if the jury, while bearing in mind both these presumptions that I have mentioned (i. e. that the defendant is innocent until he is proved guilty, and that he is and was sane, unless evidence to the contrary appears), and considering the whole evidence in the case, still entertain what is called a 'reasonable doubt,' on any ground (either as to the killing or the responsible condition of mind), whether he is guilty of the crime of murder, as it has been explained and defined, then the rule is that the defendant is entitled to the benefit of that doubt, and to an acquittal."

The true principle, therefore, is that the state must prove

guilt beyond a reasonable doubt, and if, upon the whole evidence, no matter whether the state or defendant offers such evidence, the jury have a reasonable doubt whether, when defendant killed the deceased, he was sane or insane, it is their duty to give the defendant the benefit of the doubt and to acquit him. And upon this theory the judge charged—hence he was right in refusing the instruction offered.

We find no error in the record, and must affirm the judgment and order appealed from.

*Affirmed.*

