STATE, RESPONDENT, *v*. PEEL, APPELLANT.

[No. 1,407.]

[Submitted October 30, 1899. Decided December 4, 1899.]

*Criminal Law—Homicide—Trial—Jury—Peremptory Challenge — Waiver — Insanity—Nonexperts — Opinion— Cross-Examination — Experts — Hypothetical Question—Instructions—Irresistible Impulse—Presumption of Sanity—Burden of Proof—Reasonable Doubt—"Heat of Passion."*

1. Where the state waived its fourth peremptory challenge, whereupon defendant exhausted his peremptory challenges, it was not error, on the panel's being filled and passed for cause, to permit the state to peremptorily challenge a juror who was in the box when the state waived its fourth challenge; since the state's waiver of its fourth challenge was not a waiver of any subsequent challenge it was entitled to.

2. The opinions of nonexpert witnesses, touching the mental condition of the person on trial, or the validity of whose act is in controversy, must be founded upon their own observation; they cannot be permitted to give an opinion founded upon facts learned from other sources than their own observation, hence, a nonexpert witness, who was not present at a homicide, cannot express his opinion as to the sanity of the accused, based both on his previous knowledge of accused and hearsay knowledge of facts attending the homicide.

3. A nonexpert witness should always speak as of the time of his own observation, he should not be permitted to express an opinion as to the temporary or permanent nature of mental disease.

4. On a trial for homicide, a nonexpert witness, giving his opinion as to the sanity of defendant, may be asked on cross-examination what he means by "insanity" and "unsoundness of mind," where there is no attempt to confuse him with technical distinctions.

5. Where defendant had unfriendly feeling towards deceased, and, failing in an attempt to procure decedent's prosecution, went into the street, and killed him, and insanity was pleaded as a defense, it was proper for the state to ask an expert his opinion of one's consciousness and knowledge of right and wrong and unlawfulness of his act, "if he had a grudge against another, and had rationally conversed with officers about it, and should go from them, and lie in wait for his enemy until he came within the vicinity, and should shoot him, saying, 'Take that,' and, having shot him, should turn and say that he would go to the jail, and give himself up, and within twenty minutes after the shooting should talk in a reasonable manner, apparently as conscious as he had ever been," since the state, in putting the hypothetical question, had a right to assume that the evidence tending to support its theory was true.

6. A question on the subject of insanity, put to an expert in a criminal trial, need not embrace all the elements of the law of insanity, but may limit the inquiry to the degree of intelligence possessed by defendant under the circumstances of the act.

7.   In a prosecution for homicide, a charge "that if defendant knew, when committing the act, that it was wrong, and that he was mentally capable of choosing to do or not to do the act, and to govern his conduct accordingly, that he was guilty, even though he was not perfectly sane at the time of the act; and that, if his mental powers were so deficient that he had no will, conscience, or controlling mental power, or if, from violence of mental disease, his intellectual power was at the time obliterated, then he was not criminally responsible, the question being whether, at the time of the act, he had mental capacity to entertain a criminal intent, and whether he did in fact entertain it," is not erroneous in failing to charge as to irresistible impulse, where the only evidence of such impulse was defendant's statement that a few minutes before the homicide he was attacked by a dizzy spell, but had no recollection what occurred thereafter until the next day; since from his statement his act must have been the result of unconsciousness or delirium, while irresistible impulse implies knowledge of right and wrong in some degree.

8.   When one commits an act, otherwise criminal, under an irresistible impulse, which is the result of overpowering mental disease, and which he cannot control, he is not criminally responsible.

9.   The legal presumption of sanity is rebutted and disappears whenever sufficient proof is introduced to raise a reasonable doubt as to defendant's sanity.

10.  The burden of establishing the defense of insanity by a preponderance of the evidence is never cast upon the defendant. If at the end of the state's case no proof has been introduced upon this subject, the legal presumption of sanity prevails, and the burden then devolves upon the defendant to produce some proof of his insanity, but he is not bound to produce any more than is sufficient to raise a reasonable doubt of his sanity, and the moment this appears the burden is at once upon the state to establish the guilt of the defendant beyond this reasonable doubt, since a reasonable doubt of the sanity of the defendant is, in a legal sense, a reasonable doubt of his guilt.

11.  Where instructions on a material point in a criminal case are inconsistent, some correct and others incorrect, a conviction will be reversed.

*Appeal from District Court, Madison County; M. H. Parker, Judge.*

Martin Peel was convicted of murder in the first degree, and he appeals. Reversed.

### STATEMENT OF THE CASE.

The defendant herein was found guilty of murder in the first degree in the district court of Madison county on December 16, 1898. Thereafter a motion for a new trial was made. This was heard and overruled on March 15, 1899. The court thereupon pronounced judgment fixing the death penalty.

The main facts leading up to the homicide are the following: William Ennis, the deceased, lived at Ennis, a village in Madison county, and kept a store there. The defendant resided near the village on a farm. The two had not been on friendly terms for two years or more. The origin of this unfriendliness is not revealed by the proof. In May or June

of 1897 a public hall at Ennis was burned. The deceased and his son William and others, at the instance of the deceased, met at the store shortly after the burning of the hall, and had some talk about going and hanging the defendant, whom they charged with burning the building. Nothing came of the meeting; no action was agreed upon. The deceased, the next morning, declared that they would wait until the defendant went to his mines in the mountains, when he could easily be disposed of with safety. During the early spring of 1898 rumors of the charges made against him by the deceased and associates came to the ears of the defendant; he was also told of the meeting at Ennis' store, and that the tracks of some man had been followed by Ennis and others from the scene of the fire to a point near defendant's house. The defendant thereupon became anxious to punish Ennis and his associates, insisting that they were guilty of a conspiracy to murder him, claiming also that his life was in danger. He talked of this with his neighbors and acquaintances. He several times visited the county attorney about prosecuting the deceased and his son. Being unable to obtain redress, as he thought, because this officer was in the employ of Ennis, he wrote to Hon. Wilbur F. Sanders, who resides in Helena, soliciting his services. Failing again to get the prosecution started, he went to Virginia City, the county seat, where court was in session, intending to see the district judge and lay his complaint before him. This was on June 18, 1898, the day of the homicide. He sought out Hon. M. H. Parker, the presiding judge, at the court house, but the judge refused to talk with him on the subject of his complaint, telling him he must seek advice elsewhere. Thereupon he turned, and went down the street to a point a short distance from the Madison Hotel, where he and the deceased had taken lunch on that day. While sitting there on a box, he saw the deceased leave the hotel, and pass down the street on the opposite side. After proceeding a short distance, deceased beckoned a friend across the street, and entered into conversation with him, standing with his side toward defendant, and apparently not

seeing him. Defendant arose, crossed the street, drew his pistol, and shot him, saying, "You will hang me, will you, you s—— o—— b——?" or similar words. The deceased died on July 4th thereafter. Defendant, after firing the shot, went immediately to the county jail, and delivered himself up to the sheriff. It does not appear whether, when the defendant went to Virginia City, he knew that the deceased was there. The defendant has appealed from the judgment of the district court and the order denying him a new trial. He alleges prejudicial error in many particulars.

*Mr. S. V. Stewart* and *Messrs. Hartman & Hartman,* for Appellant.

*Mr. C. B. Nolan, Attorney General,* and *Mr. W. F. Sanders,* for Respondent.

The *burden of proving* insanity as a defense, in a murder case, rests on the defendant—not to prove it beyond a reasonable doubt—but by such a preponderance of the evidence as to satisfy the jury of the truth of the plea. The legal presumption of sanity must be rebutted by the defendant, and the whole evidence must satisfy the jury by such a preponderance that, if the single issue of sanity or insanity was submitted to them in a civil case, they would find that he was insane. This is a rule adopted in a majority of the states, as well as in England, by well considered opinions. (*People* v. *Schryver,* 42 N. Y. 1; *People* v. *Travers,* 88 Cal. 233, and cases cited; *People* v. *Bawden,* 90 Cal. 195; *Boswell* v. *State,* 63 Ala. 307; *McKenzie* v. *State,* 26 Ark. 334; *State* v. *Hoyt,* 46 Conn. 330, S. C., 47 Conn. 518; *State* v. *Lewis,* 20 Nev. 333; *Westmoreland* v. *State,* 45 Ga. 225; *State* v. *Bruce,* 48 Ia. 530; *Brown* v. *Commonwealth,* 14 Bush. 398; *State* v. *Lawrence,* 57 Me. 574; *Commonwealth* v. *York,* 9 Metc. 93; *Commonwealth* v. *Eddy,* 7 Gray 583; *State* v. *Grear,* 29 Minn. 221; *State* v. *Erb,* 74 Mo. 199; *State* v. *Payne,* 86 N. C. 609; *People* v. *Allender,* 117 Cal. 82; *State* v. *Larkins,* (Idaho) 47 Pac. 945; *Bergin* v. *State,* 31 Oh. St. 111; *Kelch*

v. *State,* 55 Oh. St. 146; *Myers* v. *Commonwealth,* 83 Pa. St. 141; *Jones* v. *State,* 13 Tex. App. 1; *Dejarnette* v. *Commonwealth,* 75 Va. 867; *Strander* v. *State,* 11 W. Va. 745; Section 2081, Penal Code; *People* v. *Hong Ah Duck,* 61 Cal. 394; *People* v. *Knapp,* 71 Cal. 1; *People* v. *Dillion,* 8 Utah 92.)

The same principle has also been laid down in this state, in the case of *Territory* v. *Edmonson,* 4 Mont. 141, when it was held that in cases of homicide, the true and better rule, according to both principle and statute, is that matters of justification, excuse or mitigation should be proven, as any ordinary fact, by a preponderance of testimony.

MR. CHIEF JUSTICE BRANTLY, after stating the case, delivered the opinion of the Court.

1.      During the selection of the jury, 12 men being in the box, and both parties having passed them for cause, counsel for state waived their fourth peremptory challenge. The defendant thereupon exhausted his seventh and eighth peremptory challenges, the box being filled again after each challenge. Both parties then having passed for cause, counsel for the state were permitted, over the objection of defendant, to peremptorily challenge one Connor, who was in the box at the time the state's fourth challenge was waived. Connor was ordered to stand aside, and another juror was called to take his place. He was found satisfactory to both sides, and thereupon, the defendant waiving further challenges, the jury were sworn. The action of the court in permitting the challenge of Connor is assigned as error. In *State* v. *Sloan,* 22 Mont. 293, 56 Pac. 364, we held that the parties must exercise their right of peremptory challenge alternately, the state exhausting one challenge and the defendant two, until both are satisfied, or their challenges have all been used. The corollary to this rule is that, where either party fails to challenge in his turn he is deemed to waive the challenge or challenges he might use at that time. But the rule goes no further than is necessary to preserve the alternation required by the statute. (Code of Civil Procedure, Section 1059; Penal Code,

Section 2057.) It does not follow that either party waives any other challenge he may still have. His refusal to challenge may be taken by the court as an announcement that he is satisfied with the jury as then constituted but not that he will be satisfied with it when differently constituted by the change wrought by challenges exercised by the other side. There is no provision of the statute prohibiting either party from thereafter using a challenge upon any juror in the box so long as he has one to use. He may use it as he pleases at any time before the jury is finally accepted and sworn. We think the court was clearly right in overruling the objection, both upon principle and authority. (1 Thompson on Trials, Section 94; *People* v. *Ah You*, 47 Cal. 121; *Fountain* v. *West*, 23 Iowa 9; *People* v. *Carrier*, 46 Mich. 442, 9 N. W. 487; *Hamper's Appeal*, 51 Mich. 71, 16 N. W. 236; *Kennedy* v. *Dale*, 4 Watts & S. 176; *People* v. *Montgomery*, 53 Cal. 576; *State* v. *Pritchard*, 15 Nev. 74.) .

2. The defense relied on at the trial was insanity. Riblett, a witness for defendant, was his nearest neighbor, having lived upon a farm adjoining the defendant's for several years. He was permitted to detail fully his acquaintance and intercourse with the defendant, and his observation of his conduct and condition during his acquaintance with him, particularly with reference to the two years immediately prior to the shooting. This narration included an account of two attacks of illness suffered by defendant—one during the winter of 1896–97, and the other during the winter following; his incomplete recovery, and his subsequent feeble and nervous physical condition during the spring of 1898. It also included several conversations with defendant about the behavior of Ennis and his son towards himself, and defendant's attempts to bring them to punishment, one of which took place two days before the homicide. He also stated that he had heard of the shooting two days after it occurred. He was then asked: ''After hearing of the shooting, and taking into consideration the facts that you have testified about, and your long knowledge and acquaintance with Mr. Peel, did you

have any opinion then, taken in connection with the shooting, as to the condition of his mind at the time of the shooting?" Upon objection by the state, the court refused to permit the witness to answer, on the ground that the opinion of a layman as to the mental condition of the defendant, based in part upon facts not derived from his own observations, is incompetent. To this ruling the defendant excepted. The question is awkwardly expressed, but it was evidently intended that the witness, in giving his opinion, should base it upon his own observation as detailed by him, and also upon his hearsay knowledge of the facts attending the shooting. As the witness was not an expert, the ruling of the court was clearly correct. While the opinions of nonexpert witnesses are often the best and only evidence at hand touching the mental condition of the person on trial, or the validity of whose act is in controversy, the opinion expressed must be founded upon their own observation. (*Territory* v. *Hart*, 7 Mont. 489, 17 Pac. 718, and authorities cited; *Territory* v. *Roberts*, 9 Mont. 12, 22 Pac. 132; 1 Clevenger, Med. Jur. of Insanity, p. 580.) It is only a person skilled in the particular science, art, or trade concerning which the investigation is had who can be permitted to give an opinion founded upon facts learned from other sources than his own observation. (Code of Civil Procedure, Section 3146.) If he has had an opportunity to observe, he may speak from observation. When he has had no such opportunity, he may hear facts detailed by other witnesses, and express an opinion thereon; or the question may be put to him in hypothetical form, founded upon facts thus detailed. (Lawson on Expert Evidence p. 221, rule 42.) And herein lies the distinction between the office of an expert and that of a layman when called upon in such case for an opinion. If a lay witness may be permitted to include one material fact, or group of facts, learned by hearsay among those derived from his own observation, as in the question under consideration, and to express an opinion thereon, there is no reason why any number of such facts may not be so included. In such case the opinion of the witness, in so

far as it would be based upon the extraneous facts, would in no respect be different from that of an expert witness, and the important and substantial distinction between the offices of the two would be entirely destroyed. , (Lawson on Expert Evidence, p. 538.) The witness was afterwards permitted to express his opinion as to the mental condition of defendant, basing it upon his own observation. This was within the rule and the defendant has no cause for complaint.

In this connection the court instructed the witness to express the opinion formed by him with reference to his observations of defendant up to and including the time he last saw him. The witness answered in conformity with this direction, expressing the opinion as still retained by him. Fault is found with this action of the court, counsel for defendant contending that the witness should have been allowed to state his opinion as to the mental condition of defendant at the time of the shooting. Here again we think the court was right, because the nonexpert witness should always speak as of the time of his observation. To have allowed this witness to do otherwise would be equivalent to permitting him to give an opinion upon the character of the mental disease, and as to whether it probably continued up to the date of the shooting. The witness could not speak of a condition he did not observe, nor should he be permitted to express an opinion as to the temporary or permanent nature of the disease. This is the province of the expert. (1 Clevenger Med. Jur. of Insanity 588; *Blake* v. *Rourke,* 74 Iowa 519, 38 N. W. 392; *Denning* v. *Butcher,* 91 Iowa 425, 59 N. W. 69.)

On cross-examination the witness was asked to tell the jury what he meant by "insanity" and "unsoundness of mind." The court directed him to answer. This he did, explaining in his own way what meaning he attached to those terms. There was no attempt to compel him to give a technical definition of them, nor to confuse him by questions pertaining to technical distinctions. This was clearly within the range of proper cross-examination.

3. In rebuttal the state introduced Dr. Miller as an expert

upon the question of defendant's insanity. Among other hypothetical questions, he was asked the following: "Where a party has a grudge against another, and had avowed it, and had in a rational way conversed with lawyers and judges about it, and he should go from them, and lie in wait for his enemy, or remain in the vicinity until he appeared on the sidewalk, and then should get up and go across the street from where he was, and draw a revolver, and shoot him, saying, 'Take that,' or words to that effect, and, having shot his enemy, should turn around again, and say, 'I will go to the jail and give myself up,' and within twenty minutes or half an hour should talk the matter over in a reasonable manner, apparently as conscious as ever he had been immediately before the shooting, what would you say as to the fact of his consciousness and knowledge of right and wrong and knowledge of the unlawfulness of his act at the time of the shooting, from these circumstances?" Defendant objected on the ground that the hypothesis assumed that the defendant entertained a grudge against deceased, and that he was lying in wait for deceased at the time of the homicide, an assumption not justified by the proof; and also on the ground that it involved an erroneous statement of the law of insanity as a defense in criminal prosecutions. The objection was overruled, and the witness answered, "I should consider he was conscious of what he was doing." The objection was without merit. The evidence had shown without contradiction that there had been unfriendly feeling between defendant and deceased for some time, though the cause of it did not appear. It had also shown, as set forth in the statement of facts leading up to the homicide, that the defendant had been charged by deceased with burning the public hall at Ennis; that there had been some talk by deceased and others of hanging defendant for this crime; that he had heard of this talk, and was so wrought up by it that he sought to have deceased and his son punished for a conspiracy to murder him; that, having failed to get the prosecution under way, he had, as a last resort, gone to the judge then engaged in holding court at Virginia

City; that, upon being told by the judge that he must go elsewhere for advice, he had gone at once to a point near the hotel where deceased was stopping, and remained there; that he was armed; and that, when he saw deceased leave the hotel, and proceed down the other side of the street, he immediately went toward him, and shot him.    It further appeared from the defendant's own statement that, though he was entirely innocent of the charge made against him by deceased and his son, he believed they intended to take his life when a suitable opportunity presented itself.    In another part of his testimony he had also stated that he had sought out the deceased because he was the only one that he feared of those who attended the meeting at Ennis, where the hanging was discussed, and that he was on friendly terms with everybody in the community except deceased.    Can any reasonable person doubt for a moment that the defendant, under these circumstances, if he was sane, entertained towards the deceased and those associated with him the strongest feeling of resentment and ill will?    If he did not, he surely was not subject to the passions that ordinarily sway mankind, or else had schooled himself to such a degree of self-control and Christian forbearance as to have become a remarkable instance in proof of the possible attainment by mankind of absolute moral perfection. The state's theory of the case was that defendant was and is so far a reasonable moral agent as to be responsible under the law.    Upon this assumption counsel were proceeding, and it was necessary that they be allowed to proceed in this way in order to properly try the case.    In putting the hypothetical question to the expert, they had a right to assume as established, for the time being, all the facts in evidence tending to support their theory.    It was a legitimate inference from the evidence, under this theory, that the defendant retained a grudge against the deceased, and that, prompted by a desire to gratify his feelings of revenge, he lay in wait for the opportunity to strike the fatal blow.    It was for the jury to say, after considering all the evidence introduced by both sides, whether the facts, thus assumed as established for the

time being, were really established, and whether the opinion of the witness was worthy of consideration. (Lawson on Expert Evidence, 152, 153; 1 Thompson on Trials, Sections 607–610, and cases cited.)

Counsel were not compelled to so frame their question as to embrace in it a statement of all the elements of the law of insanity. Capacity to distinguish between right and wrong with reference to the particular act in controversy is certainly a prerequisite to legal responsibility, and whether or not the defendant possessed such capacity was necessarily a subject of legitimate inquiry in the trial of this case. If he did not possess it, he could not properly be convicted of any degree of homicide. Counsel were properly permitted to direct their inquiry in such a way as to develop proof tending to show the degree of intelligence possessed by the defendant under the particular circumstances. If they choose to limit the inquiry to this particular point, and there stop, it was not error in the court to permit it. It was for the court to state the law applicable to this defense upon the facts as they were presented.

4. In this connection complaint is made that the court failed to properly instruct the jury on the law applicable to this defense, the particular criticism being that the instructions are not sufficiently specific as to irresistible impulse. In this, we think, counsel are in error. The court, with the exception hereafter noticed, instructed the jury fully and fairly, and the law, as stated in the charge, is the more logical rule, if not based upon the weight of authority in this country. Of the several paragraphs of the charge on this phase of the case, we quote two as illustrative of the court's view:

No. 36.    "You are instructed that if, from all the evidence in the case, you believe, beyond a reasonable doubt, that the defendant committed the crime of which he is accused, in manner and form as charged in the information, and that at the time of the commission of such crime the defendant knew that it was wrong to commit such crime, and was mentally capable of choosing either to do or not to do the act or acts constituting such crime, and of governing his conduct in accordance

with such choice, then it is your duty, under the law, to find him guilty, even though you should believe from the evidence that at the time of the commission of the crime he was not entirely and perfectly sane.''

No. 37    ''You are instructed that, in order to be criminally responsible, a person must have intelligence and capacity to have criminal intent and purpose; and if his mental powers are so deficient that he has no will, or no conscience, or no controlling mental power, or if, from the overwhelming violence of mental disease, his intellectual power is, for the time, obliterated, he is not criminally responsible,—the question to be determined being whether, at the time of the act, he had the mental capacity to entertain a criminal intent, and whether in point of fact he did entertain it.''

Mr. Bishop (1 Cr. Law, Sec. 381, subd. 2) says: ''Insanity, in the criminal law, is any defect, weakness or disease of the mind rendering it incapable of entertaining, or preventing its entertaining in the particular instance, the criminal intent which constitutes one of the elements in every crime.'' From this definition of insanity, criminal responsibility is to be determined solely by the capacity of the defendant to conceive and entertain the intent to commit the particular crime.   If there is no intent, there is no crime.   In the formation of this intent there must concur knowledge or intellectual comprehension, and the power of choice.   An absence of the former necessarily implies the want of the latter, for the latter cannot, in reason, exist without it.   On the other hand, the former, as a scientific fact, may exist, in some degree at least, without the latter.   It therefore follows that one may have mental capacity and intelligence sufficient to distinguish between right and wrong with reference to the particular act, and to understand the consequence of its commission, and yet be so far deprived of volition and self control by the overwhelming violence of mental disease that he is not capable of voluntary action, and therefore not able to choose the right and avoid the wrong.   The second instruction quoted is taken from the text at page 126, Vol. I, of Dr. Clevenger's recent

work on Medical Jurisprudence of Insanity, heretofore cited.
At another place the same author says: "To be criminally
responsible, a man must have reason enough to be able to
judge of the character and consequences of the act committed,
and he must not have been overcome by an irresistible im-
pulse arising from disease." (*Id.* p. 174.) Assuming, as we
do, that Mr. Bishop's definition of insanity is correct, and
sufficiently broad to cover all cases where the question of re-
sponsibility arises, the statement by Dr. Clevenger is a direct
logical result therefrom, and the doctrine that when one com-
mits an act, otherwise criminal, under an irresistible impulse,
which is the result of an overpowering mental disease, and
which he cannot control, he is not criminally responsible, must
be admitted. Mr. Bishop recognizes the doctrine, basing it
upon the law of necessity, and insists that it is the duty of
every judge to recognize and apply it as a part of the funda-
mental law of the land. (1 Bishop, Cr. Law, Sec. 383b.)
Mr. Wharton (Wharton's Cr. Law, Sec. 45), after discussing
the subject, states the law thus: "The conclusion we must
reach, therefore, is that an irresistible homicidal impulse in
an insane person is a good defense, though such insane person
was able to distinguish between right and wrong. With a
sane person, however, it is not a defense, as the law makes all
sane persons responsible for their impulses." It is, we think,
the more humane doctrine, and in accord with the more ad-
vanced state of medical science and judicial reason, though
courts of high standing—as in New York, California, Kansas,
Georgia, North Carolina, Missouri and others—repudiate it,
and adhere to the doctrine of the right and wrong test. The
following authorities are cited: Taylor's Med. Jur. 734;
*Com.* v. *Rogers,* 7 Metc. (Mass.) 500; *Stevens* v. *State,* 31 Ind.
485; *Walker* v. *State,* 102 Ind. 502, 1 N. E. 856; *Conway* v.
*State,* 118 Ind. 482, 21 N. E. 285; *Parsons* v. *State,* 81 Ala.
577, 2 South. 854; *State* v. *Windsor,* 5 Har. (Del.) 512; *Ort-
wein* v. *Com.* 76 Pa. St. 414; *Taylor* v. *Com.,* 109 Pa. St. 262;
*Com.* v. *Mosler,* 4 Pa. St. 264; *Graham* v. *Com.,* 16 B. Mon.
587; *Blackburn* v. *State,* 23 Ohio St. 146; *State* v. *Pike,* 49

N. H. 399; *State* v. *Jones*, 50 N. H. 369; *State* v. *Johnson*, 40 Conn. 136; *Anderson* v. *State*, 43 Conn. 514; *Dejarnette* v. *Com.*, 75 Va. 867; *State* v. *Felter*, 25 Iowa, 67; *State* v. *Mewherter*, 46 Iowa 88; *Dacey* v. *People*, 116 Ill. 555, 6 N. E. 165; Hochheimer Law of Crimes, Sec. 20.

But, while we believe this to be the better rule, we agree with Mr. Bishop where he further says, in speaking of the right and wrong test: "In a case wherein beyond controversy the defect extends only to the intellectual powers, and there is no pretense that the party cannot control his own actions,—no proof tending to show any insanity except the partial, which veils simply the understanding and not the whole man,—this right and wrong test, thus seen to be the more common form of putting the question to the jury, is correct in legal theory, and practically not misleading. For it should be borne in mind that in all issues the charge to the jury should disclose the law applicable to whatever facts the evidence tends to establish, not to any which it does not." (1 Bishop Cr. Law, Sec. 386, Subd. 2.)

Returning now to the test laid down in the instructions quoted, we see that they distinctly recognize the doctrine of irresistible impulse as the result of disease. In our opinion, they are well suited to the facts of this case. There was no proof tending to show in the defendant, at the time of the shooting, the existence of an irresistible impulse, except in so far as it might be inferred from the statement of the defendant himself, who testified in his own behalf, and stated that, as he left the court house, he was attacked by a "dizzy spell," and had no recollection of what occurred thereafter until the following morning. Even this would seem to rebut the idea of any such condition, and tend rather to show that the shooting, if the result of any phase of insanity, was the act of unconscious madness or delirium; for, logically, the expression "irresistible impulse" implies knowledge of right and wrong in some degree, but, coupled with it, the absence of power, resulting from a disordered mind, to successfully resist the impulse to do the criminal act. The court could

not instruct the jury on every phase or manifestation of insanity. The law was declared generally upon this, subject with such suggestions as were suitable to the facts of the case; and it was left to the jury, as was proper, to find from the proof upon the issue of insanity. (*Stuart* v. *State*, 1 Baxt. (Tenn.) 178.) The court was also careful to draw the distinction between the impulse of anger or passion which does not relieve from responsibility and the phase of insanity which we are here considering. This should be done in all cases of this character, so that the wicked impulses of the evil passions, which every man is, under the law, bound to keep in restraint, may not be confounded with that phase of mental disease which the law, out of tenderness for human life and liberty, deems a sufficient excuse for crime. (*State* v. *Brooks*, 23 Mont. 146, 57 Pac. 1038.)

5. Upon the burden of proof under the plea of insanity the following instruction was given:

"No. 42. You are instructed that the law presumes every person to be sane and responsible for his acts until the contrary be shown by the evidence, and, when insanity is set up as a defense to an alleged criminal act, the burden of proof is upon the defendant to show by a preponderance of the evidence that he was affected by insanity, as explained in these instructions, at the time of the act, to such an extent that he did not know that it was wrong to commit such criminal act, and that he was not mentally capable of choosing either to do or not to do the act or acts constituting such crime, and of governing his conduct in accordance with such choice; but if, upon all the evidence in the case, the jury entertain a reasonable doubt as to the sanity of the defendant at the time of the commission of the act complained of, they must acquit him."

This instruction was followed by another paragraph correctly defining "preponderance of evidence" as applicable to civil cases, thus emphasizing the necessity for the defendant to sustain his defense by a preponderance of the evidence. We think this was prejudicial error. The instruction is inconsistent with itself, in that, after telling the jury that the

burden is upon the defendant to establish insanity by a preponderance of the evidence, it again tells them to acquit him if they have a reasonable doubt upon the whole case. It also conflicts in this regard with other instructions as to reasonable doubt. It is wrong in principle, because, under our view of the law, the burden of establishing this defense by a preponderance of the evidence is never cast upon the defendant.

As to the inconsistency of the instruction with itself and with others upon the subject of reasonable doubt, it is sufficient to say that, wherever instructions are upon a material point, the one correct and the other incorrect, this court will not presume that the jury followed the correct instruction, but will reverse the judgment, and order a new trial. (*State v. Rolla*, 21 Mont. 582, 55 Pac. 523.)

The first part of the paragraph states a wrong principle: The doctrine of reasonable doubt must be applied to every fact material and necessary to establish the defendant's guilt. It should be applied in all criminal cases,—to those in which insanity is the defense as well as others. Yet under this statement the defendant could be acquitted upon a reasonable doubt which might arise only after he had produced proof sufficient to incline the balance in his favor on the issue of insanity. If there should be an equipose, he could not be acquitted, because the proof would not have weight to the degree at which the reasonable doubt could come to his aid. Under the same condition of proof in a civil case, where the burden was upon the plaintiff to make out his case, the defendant would be entitled to a judgment in either instance. Nor is the fallacy of the position obviated by the statement that the legal presumption of sanity must be rebutted by the defendant. This presumption is rebutted and disappears whenever sufficient proof is introduced to raise a reasonable doubt as to defendant's sanity. And it makes no difference from which side it comes. From the moment it appears the burden is at once upon the state to establish the responsibility of the defendant, and that beyond a resonable doubt; for legal responsibility is a necessary ingredient of guilt, and a reason-

able doubt of the sanity of the defendant is, in a legal sense, a reasonable doubt of his guilt. If at the end of the state's case no proof has been introduced upon this subject,—and the state is not bound to introduce any in the first place,—the legal presumption of sanity remains unimpaired, and prevails. The burden then devolves upon the defendant to produce some proof tending to show that he was not responsible at the time the criminal act was committed, but he is not bound to produce any more than is sufficient to raise a reasonable doubt. If this is not then successfully rebutted by the state, he is entitled to an acquittal. It is only in this sense that the burden ever rests upon him under Penal Code (Sec. 2081), as was clearly explained by Mr. Justice Hunt in *State* v. *Brooks*, *supra*. In *Davis* v. *U. S.*, 160 U. S. 467, 16 Sup. Ct. 353, 40 L. Ed. 499, Mr. Justice Harlan, in an able and lucid opinion, discusses the question under consideration, collating many of the adjudicated cases. This case is cited with approval in *State* v. *Brooks*, *supra*, and the final summing up of Justice Harlan is there quoted. The question under consideration here was not directly involved in that case, but the conclusion reached in *Davis* v. *United States* is so well supported by reason and authority that we here approve it again, and adopt it. In *Territory* v. *Edmonson*, 4 Mont. 146, 1 Pac. 738, and *Territory* v. *Tunnell*, 4 Mont. 148, 1 Pac. 742, a different construction was given a provision substantially the same as section 2081, *supra*, (section 40, Fourth Division, Rev. Stat. 1879.) We are satisfied that the interpretation there given to this provision was founded on an erroneous view of the law, and to the extent to which these cases conflict with our present conclusion as stated in *State* v. *Brooks*, *supra*, and this case, they are overruled.

6. It is contended that the court erred in defining the expression "heat of passion" in instructing the jury with reference to the crime of manslaughter. The definition given is the same in substance as the one which was disapproved in *State* v. *Sloan*, 22 Mont. 293, 56 Pac. 364. On another trial this can be avoided. No harm resulted from it in this case,

since, evidently, the jury did not have occasion to consider it, having found the defendant guilty of murder in the first degree. (*State* v. *Brooks, supra.*)

Let the judgment and order refusing a new trial be reversed, and the cause remanded, with directions to grant a new trial.

*Reversed and remanded.*