## STATE, RESPONDENT, *v.* LEAKEY, APPELLANT.

### (No. 3,015.)

(Submitted December 12, 1911.   Decided December 28, 1911.)

### [120 Pac. 234.]

*Criminal Law—Murder in First Degree—Evidence—Sufficiency
—Malice—Insanity—Definition—Declarations of Accused—
Admissibility—Opinion Evidence—"Intimate" Acquaintances
—Instructions—Refusal, When not Error.*

Murder in First Degree—Evidence—Sufficiency—Burden of Proof.
    1.   Where the evidence in a prosecution for homicide showed a deliber-
ate murder, and defendant failed to sustain the burden of showing jus-
tification, excuse or palliating circumstances, the jury could properly
find him guilty of murder in the first degree and fix the death penalty.
Same—Malice—Evidence—Sufficiency.
    2.   The fact that the victim of defendant was a stranger to him was
not conclusive upon the question of absence of hatred or malice toward
deceased; the defendant a short time prior to the killing having given
expression to his intention of shooting the person whom he should see
in possession of his saddle horse, the jury were justified in finding
malicious intent to take human life.
Same—Insanity—Declarations of Accused—Admissibility.
    3.   Under the rule that declarations of one accused of crime, made either
before or after the criminal act, are admissible on the question of his
sanity or insanity, it was error to exclude statements made by defendant
a few hours after the homicide and upon being roused from a deep sleep,
to the effect that he did not believe he had killed a man, that there was
no reason why he should have killed anyone, etc.

Same—Insanity—"Intimate" Acquaintances—Opinion Evidence—Admissibility.

4. The testimony of a witness who had known defendant about four months, and who had qualified as an intimate acquaintance, under section 7887, Revised Codes, that in his opinion defendant was insane, was improperly stricken from the record, even though he admitted on cross-examination that he had told the county attorney the day before that he thought defendant was sane, and that he based this latter opinion upon conversations had with other persons on the night previous; the later statement weakened the effect of his former testimony but did not render it incompetent.

Same.

5. One who had known defendant but three weeks, had met him only at meals and never conversed with him in person, was incompetent to express an opinion that defendant was sane, not having been an "intimate" acquaintance within the meaning of section 7887, Revised Codes.

Same—Insanity—Definition.

6. An instruction defining insanity as "any defect, weakness or disease of the mind, rendering it incapable of entertaining, or preventing its entertaining in the particular instance the criminal intent which constitutes an element of every crime," and declaring that if defendant was incapable of choosing the right and avoiding the wrong he was not responsible for any act committed by him while in this condition, correctly stated the law on the subject.

Same—Instructions—Refusal—When not Error.

7. It is not error to refuse requested instructions fully and fairly covered by the charge given.

*Appeal from District Court, Dawson County; Sydney Sanner, Judge.*

MAX M. LEAKEY was convicted of murder in the first degree, and appeals from the judgment of conviction and an order denying his motion for a new trial. Reversed and remanded.

*Mr. C. C. Hurley,* for Appellant, submitted a brief and argued the cause orally.

It was error to exclude questions asked of the witnesses Wynn and Bushell, concerning the mental condition of the defendant, since it is competent for an ordinary witness to express an opinion concerning the health or physical or mental condition of another. (Rogers on Expert Testimony, 9; *State* v. *Trueman,* 34 Mont. 249, 85 Pac. 1024; *People* v. *Sehorn,* 116 Cal. 503, 48 Pac. 495; *State* v. *Dolan,* 17 Wash. 499, 50 Pac. 472; 3 Wigmore on Evidence, sec. 1877; 17 Cyc. 91.) The witness Peters expressed an opinion that the defendant was insane. This opinion

was from necessity based upon his acquaintance and knowledge of the previous history and actions of the defendant, and any fact or circumstance which was an element or a circumstance furnishing a basis for the opinion expressed by the witness Peters was a legitimate subject of inquiry and competent evidence, and it was error for the court to exclude the testimony. (*People* v. *Shattuck,* 109 Cal. 673, 42 Pac. 315.) To judge the mental deficiency of a person, the entire conduct of the individual through life may be taken into account. (*St. George* v. *Biddeford,* 76 Me. 593.) Where the question of the insanity of the accused is submitted to the jury, it is error to reject evidence offered by him as to the trend of his mind subsequent to the commission of the crime. (*Moore* v. *Commonwealth,* 92 Ky. 630, 18 S. W. 833; *State* v. *Hays,* 22 La. Ann. 39.) Insanity of the prisoner at the instant of the commission of the offense can only be established by evidence tending to prove that he was insane at some period before or afterward. (*People* v. *March,* 6 Cal. 543; *State* v. *Lewis,* 20 Nev. 333, 22 Pac. 241; *French* v. *State,* 93 Wis. 325, 67 N. W. 706.)

While ability to distinguish between right and wrong is in many jurisdictions made a test of the measure of insanity, the doctrine has never met with the approval of the medical profession, and has also been repudiated by many courts in this country. (*Parsons* v. *State,* 81 Ala. 577, 60 Am. Rep. 193, 2 South. 854; *Boardman* v. *Woodman,* 47 N. H. 120; *State* v. *Pike,* 49 N. H. 399, 6 Am. Rep. 533; *State* v. *Jones,* 50 N. H. 369, 9 Am. Rep. 242.) It was competent for the defendant to show any fact or circumstance indicating a diseased or weak mind, and it was for the jury to say whether the same was sufficient to render the defendant insane. (*People* v. *Worthington,* 105 Cal. 166, 38 Pac. 689; *State* v. *Berberick,* 38 Mont. 423, 100 Pac. 209, 16 Ann. Cas. 1077.)

By instruction No. 3 the court was asked to instruct the jury that their personal opinion as to facts not proved cannot properly be considered as the basis of their verdict. This is an instruction that should have been given, if no instruction was

given that covered the matters embodied in it. (Blashfield on Instructions of Juries, sec. 360; *Ramsey* v. *Burns,* 27 Mont. 154, 69 Pac. 711; *Spies* v. *People,* 122 Ill. 79, 3 Am. St. Rep. 320, 12 N. E. 865, 17 N. E. 898; *Villereal* v. *State* (Tex. Cr.), 61 S. W. 715.)

All disputable presumptions give way before the presumption of innocence, which belongs by right to every defendant, and which remains with him until the prosecution has established his guilt beyond a reasonable doubt. There cannot be two presumptions in a criminal case. Hence defendant's requested instruction No. 4 should have been given. (*People* v. *Douglass,* 100 Cal. 1, 34 Pac. 490; *People* v. *Strassman,* 112 Cal. 683, 45 Pac. 4; *Bickerdike* v. *State,* 144 Cal. 698, 78 Pac. 277; *People* v. *Le Doux,* 155 Cal. 535, 102 Pac. 517.)

Insanity in criminal law is any defect, weakness or disease of the mind rendering it incapable of entertaining or preventing its entertaining in the particular instance the criminal intent which constitutes one of the elements of every crime. (*State* v. *Keerl,* 29 Mont. 508, 101 Am. St. Rep. 579, 75 Pac. 362.) The cause of the insanity is immaterial. It is sufficient that the defendant was at the time of the commission of the offense charged in such a condition mentally, that he was incapable of entertaining the criminal intent required to constitute the offense charged. He was entitled to interpose the defense of insanity and have it considered by the jury, whether his insanity was caused by the excessive use of intoxicating liquors, from physical injuries, or natural defects, or any other cause. If a person is insane through the use of intoxicating liquors, he is entitled to the same protection under the law as a person who is insane through any other cause. Insanity is allowed as a defense in criminal cases for the reason that an insane person has not the mental ability to control his actions or entertain the criminal intent required to constitute the offense charged. We submit that it was prejudicial error for the court to give requested instruction No. 22.

*Mr. Albert J. Galen,* Attorney General, and *Mr. W. H. Poorman,* Assistant Attorney General, submitted a brief in behalf of the State. *Mr. W. S. Towner,* Assistant Attorney General, argued the cause orally.

It is a settled rule that a lay witness may give in evidence his opinion on many unscientific questions (*State* v. *Trueman,* 34 Mont. 249, 85 Pac. 1024) ; but we do not believe any case can be found affirming the doctrine that a lay witness may give in evidence his opinion respecting any matter, thing, condition or quality that is not evidenced or made manifest by some external or physical condition, action or property. A cannot tell what B is thinking about unless A is a mind reader and then he should be qualified as an expert. The only case where a lay witness may express an opinion on matters latent, occult, veiled or unseen is the mental condition of the defendant or testator, and this is by reason of the statute (subd. 10, sec. 7887, Rev. Codes), and is limited to intimate acquaintances and the reasons must be stated. It is held in *State* v. *Byrd,* 41 Mont. 585, 111 Pac. 407, that an offer of proof should be made. No such offer was made by the defendant. This holding in the *Byrd Case* was modified in *State* v. *Wakely,* 43 Mont. 427, 117 Pac. 95, but the modification only extended to questions asked on cross-examination.

The witness Peters was asked to state whether he had ever discussed the proposition of defendant's mental condition with other persons. An objection was sustained to this question. This evidence was wholly incompetent and hearsay and was an attempt to prove defendant's insanity by reputation and hearsay. The witness testifying was a lay witness and the evidence offered was incompetent. (*State* v. *Peel,* 23 Mont. 358, 75 Am. St. Rep. 529, 59 Pac. 169; *State* v. *Lagoni,* 30 Mont. 472, 76 Pac. 1044; *State* v. *Penna,* 35 Mont. 535, 90 Pac. 787.)

Declarations which are narratives of past events cannot be introduced in evidence. (Wharton on Criminal Evidence, par. 264; *People* v. *Ehring,* 65 Cal. 135, 3 Pac. 606; *Territory* v. *Clayton,* 8 Mont. 1, 19 Pac. 293; *State* v. *Tighe,* 27 Mont. 327,

71 Pac. 3.) The only ground on which such declarations can be admitted are that they are a part of the *res gestae,* and before they are admissible on this ground, they must have been made so near the time of the commission of the act to which they relate that they were in effect the act itself, speaking through the individual and not the individual speaking in his own behalf. (Wharton's Criminal Evidence, par. 691.)

A lay witness may, by reason of the statute, subdivision 10, section 7887, Revised Codes, state his opinion, "the reason for the opinion being given"; but he may not give an expert opinion as to what conclusions should be reached from a state of facts not observed by him. (*State* v. *Peel,* 23 Mont. 358, 75 Am. St. Rep. 529, 59 Pac. 169.)

Defendant's proposed instruction No. 3 had its inception in *Spies* v. *People,* 122 Ill. 18, 3 Am. St. Rep. 320, 12 N. E. 865, 17 N. E. 898, and was held error by this court in *State* v. *Kremer,* 34 Mont. 6, 85 Pac. 736.

Defendant's requested instruction No. 4 is to the effect that all presumptions are subordinate to the presumption of innocence and that no fact or circumstance necessary to establish the guilt of the defendant can be presumed. This is not a true statement of the law. There are many things which are necessary in a criminal case that are presumed. Everyone is presumed to be sane. An unlawful act is presumed to be done with an unlawful intent. It is presumed that a person intends the ordinary consequence of his voluntary act. (Rev. Codes, sec. 7962.) While all of these presumptions as well as others named in that section are disputable, yet they will stand as facts proven until overcome by evidence. The instruction offered was evidently taken from *People* v. *Le Doux,* 155 Cal. 535, 102 Pac. 517. The instruction offered in that case was properly refused because it was too broad in its terms, and in part for the very reasons here stated, but under the particular facts in that case and by reason of the fact that there were many presumptions arising from the evidence, as continued marital relations, etc., the court held it would have been proper to have instructed the

jury with reference to the relative merit of the presumption. The same court, however, in *People* v. *Douglass*, 100 Cal. 1, 34 Pac. 490, held that it was not error to refuse an instruction of this kind.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

The defendant was convicted of murder in the first degree and sentenced to death. He has appealed from the judgment of conviction and an order denying his motion for a new trial. The assignments of error upon which he relies are predicated upon rulings in admitting and excluding evidence, and the action of the court in giving and refusing instructions. The contention is also made that the verdict is contrary to the evidence.

The circumstances attending the homicide, gathered from the uncontroverted statements of eye-witnesses, are the following: It occurred at the village of Wibaux, Dawson county, on August 26, 1910. The main street of the village extends north and south. Upon the west side of the street is situated a blacksmith-shop. About 100 yards to the south, and on the opposite side of the street, is a livery barn where the deceased was employed. Further to the south is a garage. The defendant had been working as a hired hand at various places in Dawson county until a few days before the homicide, the last place being at the cattle ranch of one Parsons. Leaving there he went to Wibaux. He had spent two or perhaps three days there, a part of the time in the village lockup under a charge of creating a disturbance on the street. He was addicted to drink and sometimes drank to excess. When drinking, he was quarrelsome. His brother had a ranch across the state line in North Dakota. Having been informed that his brother needed help at his ranch, the defendant had during the day hired a horse at the livery barn, intending to ride to his brother's ranch to work. He hitched the horse in front of a saloon on Main street, some distance to the north of the barn and the blacksmith-shop. The evidence does not disclose how long it remained there, nor who took it

away. About 5 o'clock in the afternoon the defendant entered the blacksmith-shop and was met at the door by the witness Jeffries, the blacksmith's helper, who witnessed the killing and the arrest of the defendant which followed immediately thereafter. His account is the following: "I was working in the employ of R. R. Bushman's blacksmith-shop. * * * I saw the defendant, Leakey, at the shop. It was about between 4 and 5 o'clock in the evening. I had a conversation with him at that time. I met him at the door—it was my custom to meet all who were coming there—and passed the time of day, and I asked what could be done, and he said he was looking for a saddle horse, and I smiled and looked at three horses there on the floor, and I said, 'There's three horses, but they don't look like saddle horses to me.' 'Well,' he says, 'By God, I am not fooling. I am mean to-day.' I says, 'You are mean, are you?' and I squared up to him in fun, and he says, 'Yes, I am,' and he reached for his gun and his gun dropped on the floor, and I says, 'There's your gun'; and he reached down and picked it up and pulled it on me, and I don't remember just what was said, but I kind of smiled and said, 'You had better put it away,' and he did so after showing me what was in the gun. He walked over to the back part of the shop, and I walked over to the other door from where he was. In our conversation he said he had a saddle horse and was going out to the ranch, and he says, 'They need me out there,' and he says, 'Somebody has got off with it, and I am going to shoot the s—— of a b—— that's got it.' That time he was at the shop a few minutes—I couldn't say, it wasn't long. I had not seen Frank Nelson before Leakey left the shop. The time that I speak of that he went toward the rear end of the shop, he didn't leave the shop at that time, but when we stepped out in front of the shop I saw Nelson riding up on a horse. There was nothing further said by Leakey about this saddle horse to me. Leakey walked up immediately and started toward the barn, and as he got to the road he had his gun in his hand and started to run toward Frank Nelson. Nelson was on the horse going to the barn, and I stepped outside of the door and hollered to Frank, and said, 'For God's sake, get

out of the way. This guy's got a gun,' and at that Frank jumped off his horse and turned around and faced Max, and Max came running up with his gun in his left hand and shot him. Nelson then fell forward as though he was dead. The minute the shot was fired and Nelson fell, the horse started down toward the garage down there. Leakey walked up and looked at Frank and then started toward the horse. I didn't see Leakey from then on until I saw him on the horse. I got in an automobile and went up to the corner and got a doctor, and when I got back Max was on the horse coming up the street. At that time Wynn was there and he told him to stop, and, instead of stopping, he pulled down at Wynn, and commenced shooting at him. At that time he was in the middle of the street—coming riding up the street. He fired three shots, if I am not mistaken. I would not swear he fired over two. At the last shot in the mix-up, Leakey fell off the horse. He threw his hands back and fell off his horse, pretty close to Wynn. * * * At the time Leakey fell off or was thrown off, or got off the horse, the horse was coming right toward Wynn. The horse was running as he came up the street there. When Leakey came to the shop at the time I mentioned, he was intoxicated." Bushman, who was present, told substantially the same story. All the witnesses agree that defendant was more or less intoxicated, though he walked without difficulty. After his arrest by Wynn, the deputy sheriff, he was taken to the lockup. Wynn testified that defendant had been drinking, and was somewhat under the influence of liquor, but was able to walk. In another place in his testimony he stated that in his opinion the defendant was drunk. The horse Nelson was riding was the one the defendant had hired earlier in the day. How Nelson came into possession of it is not explained by any witness, but the circumstances lend support to the notion that he had found it tied somewhere on the street and was returning it to the barn. Though defendant did not know Nelson, he recognized the horse as Nelson passed the blacksmith-shop, remarking, as Bushman stated, "There goes the son—— of a b——." When he started toward the barn, Bush-

man called to Nelson to get out of the way. The latter seemed not to understand, but stood facing the defendant until the shot was fired. No words were spoken by either of them.

1. We shall consider, first, the assignment that the verdict is contrary to the evidence. The defense was insanity. Evidence was introduced tending to show that during the year 1907, and subsequently, the defendant, when sober, was irritable and subject to violent momentary fits of passion which he would vent upon the tools or machinery with which he was working, sometimes to the peril of those associated with him, and that after the paroxysm had passed away he was apparently oblivious of what he had done. His disposition to yield to passion was aggravated by drink. The witness Peters had known him intimately from as early as the spring of 1905. The two were employed in logging camps at Visalia and Truckee, Cal., in the spring of 1907. Peters stated that at the latter place he himself was foreman and had the defendant employed as engineer to run the logging engine; that during the latter part of the season defendant sustained an injury to his head from a fall of several feet from the door of a cabin while intoxicated; that thereafter he seemed changed in his disposition to such an extent that if anything went wrong he would throw the tools off the engine and out of the tool-box, or would jerk the throttle wide open and turn on full steam, without regard to the safety of the machinery or the men who were working along the line of the logging cables, and that, though he had theretofore been efficient, the witness was finally compelled to discharge him because "he would get these mad spells, and did not know what he was doing, and I was afraid he would cripple somebody." The witness testified to other injuries sustained by defendant, and illustrated the change observed in his conduct by the relation of instances when he seemed to have no consciousness of what he was then doing or subsequent recollection of it. He expressed the opinion that defendant was insane.

Other witnesses testified to the same effect touching his conduct on other occasions after he came to Montana in 1909, and prior

to the date of the homicide. Some of them who were deemed to fall within the class of intimate acquaintances also expressed the opinion that he was insane. Still others testified to peculiarities in his conduct on different occasions.

Defendant himself testified concerning the injuries received by him at the time mentioned by Peters. He stated that they had affected his head permanently, inducing a condition from which there were recurring headaches, followed by discharges of pus through his nose, whereupon the pain subsided; that when he hired the horse at the barn he rode it up the street to the north and tied it at the saloon; that at the request of Baker, the saloon-keeper, he lent him the horse to ride to his home; that he did not know what then became of it; that he at once began to drink; that he had no recollection of anything that occurred thereafter during the day; that he had never met Nelson, and did not know that he had killed him, until he was afterward informed of the fact by others. He denied emphatically that he had shot Nelson. He first stated that he was able, ordinarily, to distinguish between right and wrong, and then said that he did not know whether he could or not.

To a hypothetical question embodying substantially the facts testified to by the witnesses, Dr. Hathaway, who qualified as an expert, declined to express a definite opinion as to defendant's mental condition. He stated that the facts as related to him would in some cases indicate insanity, but that he would not venture an opinion without an opportunity to make a careful examination and observation of the particular person, which he had not done in this case. He stated that some of the symptoms indicated by the facts narrated were present in ordinary insanity, while others were present in what is recognized as alcoholic insanity; but that the conduct of the defendant as related to him could be the result of an "ordinary drunk." Several lay witnesses were permitted to state their opinions that the defendant was insane at the various times about which they were questioned, giving their reasons therefor. Some of them had made their observations immediately before or at the time of the shoot-

ing.   There was evidence tending to show that soon after his arrest the defendant was apparently in a stupor and unconscious of what was going on about him.

The contention is that the verdict is contrary to the evidence, in that it does not show the existence of a deliberate purpose to take the life of Nelson, proof of which is essential to establish murder in the first degree.   Counsel assumes that there should be evidence tending expressly to show the deliberate purpose; but this is not necessary.   Indeed, it is not generally susceptible of proof in this way.   It is generally to be inferred from facts and circumstances attending the killing.   Here the killing is shown to have been done under circumstances which, aside from the alleged mental condition of the defendant, leave no room for an inference other than that it was a willful, deliberate murder.

The attempt was to show that the defendant was insane generally, or that he was suffering from momentary alcoholic insanity to such an extent that he did not know what he was doing, and hence could not have entertained a deliberate intent to take life.   The court, as we shall presently show, fully and fairly instructed the jury, both as to insanity generally, and as to the purpose which proof of intoxication may serve the defendant as a palliative or extenuating circumstance, and, to this extent, as excusatory of the crime charged against him.   The jury, having found that the defendant was not suffering from insanity rendering him irresponsible, and that he was not so far intoxicated as to render him incapable of forming and acting upon a deliberate purpose, were justified in inferring such purpose from his threatening conduct immediately prior to the killing, the character of the weapon used, search for the deceased, the absence of provocation and the manner of the killing; and having so found it was their duty to render the verdict they did.   The correctness of their conclusion is not affected by the fact that the evidence was in conflict or in such a condition that they might have reached a different result.   Under our system it is exclusively the province of the jury to find, not only upon the

question of guilt generally, but also to fix the degree of guilt, and so long as there is any substantial evidence in the case to support their finding, it cannot be disturbed.

The facts narrated by Jeffries and the other eye-witnesses, [1] show a brutal murder committed under circumstances evincing a deliberate purpose. The duty of showing excuse or palliating circumstances—that is, of adducing evidence of such facts as would raise in the minds of the jurors a reasonable doubt as to his guilt—was upon the defendant. (Rev. Codes, sec. 9282; *State* v. *Brooks,* 23 Mont. 146, 57 Pac. 1038; *State* v. *Peel,* 23 Mont. 358, 75 Am. St. Rep. 529, 59 Pac. 169; *State* v. *Fisher,* 23 Mont. 540, 59 Pac. 919.) Having failed to do this, the jury was justified in finding the highest degree of the crime, as they had the power to do (Rev. Codes, sec. 8293) and in fixing the death penalty. There is some substantial foundation in the evidence for the conclusion that the condition of the defendant following his arrest was simulated. The jury were at liberty to find that it was.

It is said that there is no evidence showing malice. This contention is predicated upon the idea that, since the defendant did not know the deceased, he could not have sustained feelings [2] of hatred or malice toward him, and hence could not properly be found guilty of any grade of homicide above manslaughter. Malice is express when there is deliberate intention to take away the life of a fellow-creature. It is implied when no considerable provocation appears or when the circumstances of the killing show an abandoned and malignant heart. (Rev. Codes, sec. 8291.) Assuming, as we must, that the jury found the defendant sane and therefore accountable for his acts, his malicious intent unlawfully to take life, though it was that of a stranger, was demonstrated by his own declaration of it at the blacksmith-shop as he started in pursuit of his victim and by his subsequent taking of his life.

2. We have examined all of the eighteen assignments based on rulings upon questions of evidence. Three of these require special notice.

About 9 o'clock in the evening on the day of the shooting, the deputy sheriff, intending to take the defendant to jail to Glendive, went to the lockup and found him asleep. Having roused him, he took him first to the railroad station, but finding the train delayed, he then took him to the office of one Bushell, a justice of the peace, and left him in charge of Bushell, where he remained until 2 or 3 o'clock next morning. Bushell, called as a witness on behalf of defendant, stated that he observed the conduct and appearance of defendant while he remained in the office; that he was sleeping with his head resting on the table and appeared to be in a sort of stupor. He described the effort necessary to arouse him as the time for taking the train approached. Quoting his own words: "We got him some coffee and some water and a drink of whisky, and tried to rouse him up. We must have got him three or four cups of coffee. We got him whisky once. I think possibly twice. * * * About half-past 1 * * * he seemed to be getting roused up; that is, he got so he could talk about that time." He then detailed the following: "He asked what he had the handcuffs on for, and I told him there was a charge of murder against him. He told me he didn't believe it, or he didn't know why he should kill anybody, and asked if I saw it. I told him I didn't, but there wasn't any doubt about his shooting the man; and he says, 'Well, if you say so, I believe you,' but he says, 'Who is the man?' I told him, and he says, 'Do I know him?' I said I thought not. He said, 'There is no reason why I should shoot him,' and he said, 'Poor John [meaning his brother], this makes more trouble for John.'" On motion of the county attorney the conversation was stricken out. This was error.

It is well settled that the declarations of one accused of crime, [3] made either before or after the criminal act, may be given in evidence on the question of sanity or insanity, for the purpose of enabling the jury to ascertain the condition of his mind. (1 Wharton & Stille's Medical Jurisprudence, sec. 323; *Lake* v. *People,* 1 Park. Cr. (N. Y.) 495; *McLean* v. *State,* 16 Ala. 672; *Cawley* v. *State,* 133 Ala. 128, 32 South. 227; *State* v. *New-*

*man,* 57 Kan. 705, 47 Pac. 881.)    Such declarations are not admissible as a part of the *res gestae* nor as self-serving declarations, but on the theory that, as substantive evidence, they reflect light upon the condition of defendant's mind at the time of the act in question, and aid the jury in determining the presence or absence of a particular purpose or intent which is a necessary element of the crime charged.    In the light of the testimony of Bushell as to defendant's physical condition, and the other facts in the evidence touching his habits and peculiarities of conduct, the conversation might be interpreted as tending to show that at the time of the killing he acted without deliberate purpose, and therefore could not be guilty of murder.    Its evidentiary value may not have been great, but, since it was competent, the defendant was entitled to have it considered by the jury for the purpose for which it was offered.    Of course if insanity did not exist at the time of the killing, the evidence would be useless as tending to show insanity, but whether it had any value for this purpose was a question to be determined exclusively by the jury.    Furthermore, though the jury should properly have concluded that the defendant was not insane, they might have concluded that the incident, following, as it did, so closely upon the time of the killing, was indicative of the extent of his intoxication, and therefore accepted it as an item of evidence to be given weight in determining the grade of his crime.    It not appearing that he had had any opportunity to drink after he was taken to the lockup, but rather that he had no such opportunity, the jury might have inferred that the condition of his mind after the lapse of the intervening hours was the same as at the time of the killing.

The witness Lee Wethers had been employed at various places [4] with the defendant, having first met him at Wibaux in May, 1910.    The association between the two had been such as to put them upon a footing of intimacy.    The witness, after qualifying under the statute (Rev. Codes, sec. 7887), was permitted to state his opinion that the defendant was insane.    On cross-examination he admitted that he had told the county attor-

ney on the day before that he thought the defendant was sane. In reply to a question by the presiding judge, he stated that he had conversed with various persons about town the previous night, and that his opinion was the result of his discussion with these persons and other witnesses in the case. Thereupon the whole of the testimony was stricken out and excluded. This also was error. The witness showed himself competent, within the meaning of the statute, to express an opinion. In his original examination he stated, as a reason for his opinion, the observations made of the conduct of the defendant during his acquaintance with him. His statement to the judge of the other reason for his opinion was inconsistent with his previous statement, but this only weakened the effect of his testimony and did not render it incompetent. The jury should have been allowed to consider it and give it such weight as they thought it entitled to.

The court also erred in permitting the witness George Albert to express an opinion that the defendant was sane. According [5] to his own statement, he had known the defendant but a short time and had formed only a casual acquaintance with him and had limited opportunity to observe his conduct. The acquaintance had covered about three weeks while the two were employed at a cattle roundup near Wibaux. He met the defendant only at meals and never had a conversation with him in person. It was said in *State* v. *Penna*, 35 Mont. 535, 90 Pac. 787, that the determination of the question what an intimate acquaintance is, within the meaning of the statute, must be left to the trial court, and that its conclusion will not be reviewed except in case of a clear abuse of discretion. Nevertheless its discretion must in all cases be used in a reasonable way. It must be called into exercise by the facts presented in each case. The acquaintance must be more than casual. The term "intimate" means "close in friendship or acquaintance; familiar; confidential"; also: "near; close; direct; thorough; complete." (Webster's International Dictionary.) A moment's consideration leads to the conclusion that it was the purpose of the legislature in enacting the statute, to settle the rule by restricting the class

44 Mont.—24

of laymen who may be permitted to state an opinion, to those who are or have been so closely related in their associations with the person the soundness of whose mind is in question, that they have become familiar with his temperaments or habits of mind. Otherwise a mere passing acquaintance would be held a qualified witness. The witness should have been confined to a statement of such observations as he made, leaving the jury to draw such inferences therefrom as they thought proper. For these errors the defendant is entitled to a new trial.

3. We do not find error in any of the instructions given. The court properly defined insanity, telling the jury explicitly in [6] the language of Mr. Bishop (1 Bishop's Criminal Law, sec. 381, subd. 2), that it is "any defect, weakness or disease of the mind, rendering it incapable of entertaining, or preventing its entertaining, in the particular instance the criminal intent which constitutes an element of every crime." The court then proceeded to enlarge somewhat upon this definition by telling them that if the defendant had not sufficient reason to be able to judge of the consequences of his act, or if he was so far deprived of volition or self-control by the overwhelming violence of mental disease that he was not capable of voluntary action, and therefore not able to chose the right and avoid the wrong, he was not responsible for any act committed by him while in this condition. In thus charging the jury the court gave in substance the instructions approved by this court in *State* v. *Peel, supra,* and *State* v. *Keerl,* 29 Mont. 508, 101 Am. St. Rep. 579, 75 Pac. 362, making the capacity to form a criminal intent the test of responsibility. The instructions also fully explained to the jury, pursuant to section 8114 of the Revised Codes, how far they might consider the intoxication of the defendant, in case they found that he was not insane, in fixing the degree of the crime with which he was charged.

The instructions requested by the defendant were all fully and [7] fairly covered by those submitted to the jury. In this feature of the trial we find no error. ·

The judgment and order of the district court are reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

MR. JUSTICE SMITH and MR. JUSTICE HOLLOWAY concur.

