STATE, RESPONDENT, *v.* SCHLAPS, APPELLANT.

(No. 6,070.)

(Submitted February 24, 1927. Decided March 28, 1927.)

[254 Pac. 858.]

*Criminal Law—Homicide—Evidence—Res Gestae—Admissibility—Insanity of Defendant—Low Mentality not Insanity—Testimony of Nonexpert—When Inadmissible.*

Homicide—Evidence—Admissibility—*Res Gestae.*
    1. Under the rule, in effect declared by section 10511, Revised Codes of 1921, that where two or more offenses are part of the same transaction, every element of the defendant's conduct therein may be shown for the purpose of illustrating the motive or intent of defendant in committing the act constituting the basis of the charge, *held,* that where husband and wife were murdered at

about the same time, and defendant was placed on trial for the killing of the latter, evidence as to the condition of the body of the former was admissible as part of the *res gestae*.

Same—*Res Gestae*—Definition.
2.   Under the law of evidence, *res gestae* are the circumstances, facts and declarations which grew out of the main fact, are contemporaneous with it and serve to illustrate its character.

Same—Two Murders at About Same Time—What Evidence Admissible.
3.   It is the universal rule that where two persons are killed at the same time and place and as a part of the same event, or approximately so, evidence as to the circumstances of the killing of one is admissible on the trial of a person informed against for the killing of the other.

Same—Evidence Admitted to Show Commission of Another Offense—Failure of Defendant to Request Instruction Limiting Effect—Appeal.
4.   Where evidence tending to show the commission of a second homicide by defendant at the same time the one for which he was on trial was committed was admissible as part of the *res gestae,* his' failure to request the court to instruct the jury as to the purpose for which it was admitted debarred him from complaining on appeal of the court's omission to limit its effect by instruction.

Same—Insanity of Defendant—When Failure of Court to Call Jury to Determine Question not Abuse of Discretion.
5.   Where in a prosecution for homicide no attempt was made to prove insanity and the question of defendant's sanity during the trial or at any time was not suggested to the court, failure of the court to call a jury to determine his sanity, a matter addressed to its sound discretion, was not an abuse thereof.

Same—Low Mentality No Defense—Evidence—Proper Rejection.
6.   Low mentality, as distinguished from insanity, is not a defense to a charge of murder; hence a question asked defendant's mother, whether he was bright or stupid, and one asked a teacher what, from an intelligence test prescribed by a certain treatise and applied by her to him and judging from her experience as a teacher, his degree of mentality was, were properly excluded.

Same—Insanity of Defendant—When Testimony of Nonexpert Inadmissible.
7.   A teacher who, before making a test of his intelligence, had seen defendant but once and knew nothing of him save what she had been told by others, was not, under section 10531, subdivision 10, Revised Codes of 1921, competent to express an opinion as to his sanity.

Same—Insanity of Defendant—Law Makes No Distinction Between Grades of Intelligence.
8.   While courts afford protection to persons of unsound mind, the law makes no distinction as between grades of intelligence nor

2.   See 10 R. C. L. 974.
3.   See 10 R. C. L. 982.
8.   See 14 R. C. L. 603.

does it measure degrees of intellect, the question being, where insanity is relied upon as a defense in a criminal action, Did the power of thought and reason exist?

---

[1] Criminal Law, 16 C. J., sec. 1115, p. 574, n. 56; sec. 1137, p. 589, n. 18; sec. 1139, p. 590, n. 25; sec. 1165, p. 601, n. 36, 37. Homicide, 30 C. J., sec. 429, p. 201, n. 45.
[2] Criminal Law, 16 C. J., sec. 1113, p. 573, n. 36; sec. 1134, p. 588, n. 8; sec. 1135, p. 589, n. 10; sec. 1140, p. 591, n. 34.
[3] Homicide, 30 C. J., sec. 429, p. 200, n. 38.
[4] Criminal Law, 16 C. J., sec. 2500, p. 1058, n. 37, p. 1059, n. 38.
[5] Criminal Law, 16 C. J., sec. 2015, p. 790, n. 41.
[6, 7] Criminal Law, 16 C. J., sec. 74, p. 99, n. 4; sec. 1540, p. 751, n. 1, p. 752, n. 6.
[8] Criminal Law, 16 C. J., sec. 72, p. 98, n. 86; sec. 74, p. 99, n. 3.

*Appeal from District Court, Roosevelt County; S. E. Paul, Judge.*

FERTINAND SCHLAPS was convicted of murder in the first degree and appeals. Judgment affirmed.

*Messrs. Moum & Morford* and *Mr. Howard M. Lewis* (the latter of Counsel on appeal), for Appellant, submitted a brief; *Mr. Lewis* argued the cause orally.

Error was committed in admitting without qualification or instruction or warning, proof of a separate offense. While the prosecution was for the murder of Ludmilla Geisler, under what would seem to be particularly atrocious circumstances, the most constant reference, during the entire trial, was made to the death of Anton (or "Tony") Geisler, her husband. Objection was made early during the trial to this constant reference to the death of Tony Geisler; and the prosecution then declared that such evidence was introduced solely "to show the motive of the defendant in the commission of that crime." Thereupon all of the objections of the defense to this line of testimony were overruled. By exhibits, the photographs of the dead bodies of both of these unfortunate persons were sought to be displayed to the jury. Repeatedly, the clothing of the dead man was referred to. Such clothing of the dead man was insistently displayed to the jury. But nowhere, at any

time or in any manner, was the jury instructed as to the purpose for which such evidence was admitted, or the weight to be given to it, or the effect which it had, according to law, or should have had, in the prosecution for the death of the woman, Ludmilla Geisler.

The rights of the defendant in regard to the proof of the separate and distinct defense "must be carefully guarded by the court in its charge to the jury, else the defendant will, as in this case, be tried, not for one offense, but for two separate and distinct crimes, at the same time." (See *State* v. *Hayes,* 14 Utah, 118, 46 Pac. 752; *People* v. *Molineaux,* 168 N. Y. 264, 290, 62 L. R. A. 193, 61 N. E. 286; *People* v. *Cook,* 148 Cal. 334, 83 Pac. 43; *State* v. *Geddes,* 22 Mont. 68, 55 Pac. 919.) It is respectfully submitted defendant was tried for the murder of two persons. Quoting from the *Geddes Case:* "Proof of the" death of Tony Geisler, "on the facts, with a view of showing guilt, was error."

There was an abuse of the sound judicial discretion of the trial court in failing to hold the sanity hearing provided for by statute. The statute (sec. 12214, Rev. Codes 1921) seems to have been directly passed upon by this court in two cases only, to-wit: *State* v. *Peterson,* 24 Mont. 81, 60 Pac. 809, and *State* v. *Howard,* 30 Mont. 518, 77 Pac. 50, both of which cases are usually cited as authority for the proposition that the opinion of the trial judge on the question of the sanity of the defendant is final; but it is respectfully submitted that neither of those authorities so hold, and whatever there is in *State* v. *Peterson, supra,* upon the subject, is *dictum,* for the reason that the judgment in the *Peterson Case* was reversed by reason of error in the exclusion of competent testimony, and, in the *Howard Case, supra,* the supreme court decided upon the appeal that "the record * * * bears out" the trial court's "conclusion" that the defendant was not insane "as correct." If it were, indeed, true that the discretion of the trial judge is absolute, then the statute, *supra,* is emasculated.

The California rule, as laid down in *People* v. *Hettick,* 126 Cal. 425, 58 Pac. 918, cited with approval by our supreme court in the *Howard Case,* was affirmed in *People* v. *Keyes,* 178 Cal. 794, 175 Pac. 6, in which it was declared that the ruling of the trial court would not be disturbed upon appeal, "unless it appears that there was a clear abuse of such discretion." It is to be noted that section 1368 of the California Penal Code is identical with our section 12214. And in *People* v. *Ah Ying,* 42 Cal. 18, the supreme court of California declared that, inasmuch as evidence upon the subject of the defendant's sanity was allowed to go to the jury, and that they were instructed upon the question of insanity, "implies a doubt on the part of the court as to his sanity." The judgment was, therefore, reversed, particularly upon the ground that the trial should have been suspended, under this statute, until the question of the sanity of the defendant was settled. No plea of insanity, the California court held, is required.

The trial judge in the instant case submitted to the jury, by its instructions, the question as to whether or not the defendant was normal or insane. If there was no doubt in the mind of the judge as to this, he certainly never would have, nor should he have, instructed the jury at all upon the question of insanity. That doubt did exist in the case. It existed in the mind of the judge, under the ruling in the *Ah Ying Case;* and, under that authority, the trial should have been suspended until the inquiry was made for which legislatures of almost every state have, in their wisdom, made provision; and it was reversible error for the trial court not to have suspended the trial forthwith and held the inquiry as to the sanity of this defendant before proceeding further with the murder trial. (See, also, *Marshall* v. *Territory,* 2 Okl. Cr. 136, 101 Pac. 139; *Stewart* v. *State,* 124 Wis. 623, 4 Ann. Cas. 389, 102 N. W. 1079.)

It was error for the court to exclude the testimony of the witnesses that he is insane. This is particularly true of de-

fendant's mother. (*People* v. *Koerner,* 154 N. Y. 355, 48 N. E. 730; Underhill on Criminal Proceedings, sec. 160, p. 308, and cases cited.) It was also true of the nonexpert witnesses whose testimony was sought to be introduced on this subject. (*Territory* v. *Hart,* 7 Mont. 489, 17 Pac. 718; *Territory* v. *Roberts,* 9 Mont. 12, 22 Pac. 132.) Beyond anything else, it was error to refuse to allow the testimony of the witness Bond, as to the mental age of the defendant, as determined by means of the intelligence test.

In *State* v. *Berberick,* 38 Mont. 423, 16 Ann. Cas. 1077, 100 Pac. 209, it was held error to exclude the testimony of a layman as to the sanity of the defendant.

*Mr. L. A. Foot,* Attorney General, *Mr. I. W. Choate,* Assistant Attorney General, *Mr. Hugh N. Marron,* County Attorney of Roosevelt County, and *Mr. Arlie M. Foor,* Assistant County Attorney, for the State, submitted a brief; *Mr. Choate* and *Mr. Marron* argued the cause orally.

Proof of the killing of Tony Geisler immediately preceding the killing of Ludmilla Geisler and the disposal of the bodies of the two victims was admissible for the following purposes: (1) It tended to prove a plan and system of criminal action executed contemporaneously by the defendant. (2) It tended to prove intent and to negative the idea of accident or mistake. (3) It tended to prove a motive, namely, that of doing away with the only person on the premises who could have discovered the killing of Tony Geisler or accused the defendant of the crime. (4) It tended to prove malice. (5) It tended to rebut the special defense of insanity. (6) It was part of the *res gestae.*

See 1 Wharton's Criminal Evidence, tenth edition, sections 30 and 31, in which the learned author notes all of the purposes above indicated as justifying the admission of the evidence of other crimes as an exception to the general rule. (See, also, the case of *People* v. *Molineaux,* 168 N. Y. 264, 62

L. R. A. 193, 61 N. E. 286.) There are cases where two or more crimes are so connected that it is impossible to distinguish them, and proof of all, in the effort to establish one, is a part of the *res gestae.* See *Brown* v. *Commonwealth,* 76 Pa. 319, where defendant killed a man and his wife at the same time; where defendant murdered his two children in bed at the same time. (*People* v. *Folcy,* 64 Mich. 148, 31 N. W. 94; *Hickam* v. *People,* 137 Ill. 75, 27 N. E. 88; *People* v. *Ascher,* 126 Mich. 637, 86 N. W. 140; *Doghead Glory* v. *State,* 13 Ark. 236; *State* v. *Hines,* 4 Am. Cr. Rep. 296.) The general rule in homicide cases appears to be that all that occurs at the time of the killing is admissible as *res gestae.* (*People* v. *Foley, supra; People* v. *Smith,* 106 Cal. 73, 39 Pac. 40.)

Evidence of the character of the wounds on the body of a murdered person is admissible in evidence on a prosecution for the murder of another, where the killing of the two men was part of one and the same transaction. "All that took place, and all that was said at the time of the killing being competent to go to the jury in determining the guilt or innocence of the accused, and the degree of the crime with which he is charged." (*People* v. *Wright,* 89 Mich. 70, 50 N. W. 792; *Wilkerson* v. *State,* 31 Tex. Cr. 86, 19 S. W. 903; *Crews* v. *State,* 34 Tex. Cr. 533, 31 S. W. 373; *People* v. *Coughlin,* 13 Utah, 58, 44 Pac. 94; *Killins* v. *State,* 28 Fla. 313, 9 South. 711; *State* v. *Craemer,* 8 Colo. App. 101, 40 Pac. 944; *Commonwealth* v. *Sturtivant,* 117 Mass. 122, 19 Am. Rep. 401.)

Error in failing to instruct the jury as to the purpose for which evidence of the killing of Tony Geisler was admitted: While the court might very properly have instructed the jury as to the purpose for which it was admitted, the defendant is in no position to complain of its failure to do so, for the reason that he neither requested any such instruction nor objected to those given. (*State* v. *Reed,* 65 Mont. 51, 210 Pac. 756; *State* v. *Stone,* 40 Mont. 88, 105 Pac. 89; *State* v. *Kacar,* 74 Mont. 269, 240 Pac. 365; *State* v. *Newman,* 66 Mont. 180,

213 Pac. 805; *State* v. *Thomas,* 46 Mont. 468, 128 Pac. 588; *Glover* v. *People,* 204 Ill. 170, 68 N. E. 464; *Carrol* v. *State* (Tex. Cr.), 58 S. W. 340; *Mosley* v. *State,* 36 Tex. Cr. 578, 37 S. W. 736; *Mixon* v. *State* (Tex. Cr.), 31 S. W. 408.)

Error in failing to hold a sanity inquisition: In *State* v. *Peterson,* 25 Mont. 81, this court held that where the question of the defendant's present sanity is presented it is within the sound discretion of the court to determine whether the matter should be inquired into in a special proceeding under the provisions of section 12214, but that the question of the defendant's sanity at the time of the commission of the offense should be tried by a jury impaneled to pass upon his guilt or innocence of the crime committed. But even under section 12214, which appellant claims authorized the court to suspend the trial and conduct a sanity inquisition, the doubt must be left to the "judicial conscience." (*State* v. *Vettere,* 77 Mont. 66, 249 Pac. 666.) Certainly this record discloses no evidence of insanity at the time of the trial, and the court did submit to the jury under proper instructions, without exception by the defendant, the question of the sanity of the accused at the time of the homicide. There is a world of difference between a low-grade moron, such as this defendant shows himself to be, and a person of unsound mind incapable of distinguishing between right and wrong. "Mere weak-mindedness is no defense. Insanity means more than this." (17 Cyc. 164 *et seq.;* 22 Cyc. 1113.) "A low order of intelligence does not tend to prove insanity." (*Powell* v. *State,* 37 Tex. 348.)

Error in excluding testimony of witnesses that defendant was insane: There was not a remote suggestion in the testimony of the mother of defendant that would indicate a condition of subnormal mentality. Similarly with the assignment of alleged error in excluding the testimony of the witness Bond "to the effect that the defendant was not sound and had the mental capacity of a child of a few years." The witness Bond could not qualify under the intimate acquaintance

rule, approved by this court in *State* v. *Leakey,* 44 Mont. 354, 120 Pac. 234, and *State* v. *Penna,* 35 Mont. 535, 90 Pac. 787. Therefore she could testify, if at all, only under the expert rule, and the record amply shows that she was not an expert. (Sec. 10531, Rev. Codes 1921; *State ex rel. Rankin* v. *Martin,* 68 Mont. 402.) In any event the qualification of the witness with respect to knowledge or special experience is a matter that rests largely in the discretion of the trial court, whose determination is usually final and will not be disturbed by the appellate court except in extreme cases, where it is manifest that the court has fallen into error or has abused its discretion and that prejudice to the complaining party has resulted. (22 C. J., p. 526, sec. 610.) "The question whether a witness who is a nonexpert is competent to testify is for the court to determine." (Underhill on Criminal Evidence, sec. 162.)

The last case cited in appellant's brief, *State* v. *Berberick,* 38 Mont. 423, has no application to the facts in this case. There the witness had testified to certain peculiarities in the conduct and demeanor of the defendant during the time of their acquaintance. He was asked to state, based on his acquaintance and the peculiarities observed, whether in his opinion the boy had an ordinarily good mind, or whether he was weak-minded. This court held that it was error not to permit an answer to this question. In the case now before the court, neither the defendant's mother nor the witness Bond ever testified to any peculiarities of conduct or demeanor on the part of the defendant, nor were either of them ever asked whether they thought the defendant was weak-minded. Likewise in the instant case, there was no other evidence of insanity that might, as pointed out in the *Berberick Case,* have been supplemented by evidence of weak-mindedness.

MR. JUSTICE GALEN delivered the opinion of the court.

By information the defendant was charged with the crime of murder. Upon his plea of not guilty he was tried by a

jury, which by its verdict found him guilty of murder in the
first degree and fixed his punishment at death. Judgment
was duly entered in accordance with the verdict, and the ap-
peal is from the judgment.

The defendant's assignments of error present four ques-
tions, all of which will be considered in disposition of this ap-
peal, *viz.:*

(1) Did the court err in the admission of proof of the com-
mission of another like offense by the defendant?

(2) Was it error for the court to fail to instruct the jury
that. the evidence relative to the commission of a crime of
similar character by the defendant was admitted solely to
prove motive and intent?

(3) Did the court err in failing to hold a hearing to de-
termine the sanity of the defendant?

(4) Did the court err in excluding evidence bearing on the
sanity of the defendant?

These four questions will be considered and disposed of in
the order stated.

The defendant was charged with the murder of Ludmilla
Geisler, in the county of Roosevelt, on or about the first day
of May, 1926. From the undisputed evidence, including a
written confession made by the accused, it appears that the
defendant, a young man eighteen years of age, went to work
for Tony Geisler on the latter's ranch located near the town
of Homestead, on April 5, 1926, at an agreed wage of $50
per month. Ludmilla Geisler, Tony Geisler's wife, was liv-
ing at the ranch with her husband, keeping house and doing
the cooking, and the defendant roomed in the house with them
and worked on the ranch until the first of May, 1926, the
date of the tragedy. While working on the ranch the latter
part of April, 1926, about a week before the commission of the
crime, he conceived the idea that he would kill both Tony and
Mrs. Geisler in order to get their Ford automobile and money
with which to return to his former residence near the town

of Ashley, North Dakota. On Saturday afternoon, May 1, 1926, the three of them were alone on the ranch, and at about 2 o'clock the defendant and his employer were at the barn harnessing the horses preparatory to going into the field to work, and Mrs. Geisler was in the house getting herself in readiness to attend a school entertainment. The defendant says that he then conceived the idea that the time was propitious to kill them while thus separated, and on the pretext of going to the house for a drink of water he left Mr. Geisler in the barn and went to the house. On reaching the house the defendant procured Mr. Geisler's single-barrel, twelve-gauge, shotgun and some loaded shells, belonging to Mr. Geisler. He explained that he took four shells for the gun so that if he did not kill them the first shot he would be able to shoot each of them a second time. Thus armed, he proceeded from the house to the barn. He loaded the gun and began looking for Mr. Geisler and located him outside the barn about fifteen feet from the door. In his written confession, he most graphically described his hideous crime and his attempt to avoid detection as follows:

"Tony and I were in the barn putting the harnesses on the horses, and I told Tony I was going to the house to get a drink of water, and at the same time I planned that I would get the twelve-gauge shotgun and some shells in the house and come back to the barn where Tony was. When I was getting the shells and gun in the house, Mrs. Geisler asked me what I wanted with the gun and the shells, and I told her I was going hunting. * * * Then I went to the barn and found that Tony was outside the barn. * * * I kept kind of hidden until I got near the barn door on the east side of the barn. Tony was standing there looking east from the barn. I took aim at his left shoulder on the side on which his heart is and fired. He fell to the ground and tried to get up again. I put another shell into the gun and fired at his head the second time, and he did not move any more after that. I then loaded the gun again and went up to the house where

Mrs. Geisler was. I walked up near the window the south side of the house and saw Mrs. Geisler standing in the bedroom looking north. I put the gun up and shot Mrs. Geisler. She hollered, but I could not understand what she said. Then I loaded the gun and went into the bedroom where she had been, and she was not there. Then I came back out into the room where I slept, and she was hid behind the clothes curtain. The first shot struck her on the left arm and side. Then I aimed at her again and fired; the second shot struck her in the neck, cutting away about one-third of her neck. Tony did not see me before I shot him; neither did Mrs. Geisler the first time. After both of them were dead, then I picked up the empty shells, put the gun away, and then threw the empty shells away in the creek bottom. Then I got a pail of water and the mop and washed up all around the house where there was blood. There was blood all around the bedroom where Mrs. Geisler was standing the first time I shot her. After I got everything all cleaned up, then I covered the oats in the wagon with a blanket to keep the horses and cattle from eating them. Then I went and unharnessed the horses and turned them loose. The first thing I done after cleaning up the blood in the house was to look for money. I found about $20 in the trunk; a $10 paper bill and some silver. It was in a pocketbook, and I put them all in my pocket. The night before I saw the pocketbook in the trunk because the trunk was open. Then I gave the cattle water. Then I got the car out and filled it up with gasoline. Then I stayed around the place until it commenced to get dark. Then I loaded the two bodies into the Ford sedan. Then I drove the car with the bodies in to the Big Muddy toward Homestead. When I got on the bridge, I threw Mrs. Geisler's body into the river. Then I saw a car coming, so I drove up to the right along the river. I put the lights out on the car and waited until the car went by. Then I put Tony's body into the Big Muddy. Then I went to Homestead and stayed there about an hour and a half. Then I drove to my

mother's place. The next morning, early, I washed the blood out of the Ford car. Then in the afternoon the sheriff and county attorney from Plentywood came over to the place where I was at my mother's place. They asked me about it, and I told them that I had taken Tony and his wife to Poplar; they were going to a hospital. There was some blood on my clothes, and they asked me about the blood on my clothes and the Ford car, and I finally told them that I had done it. Then I went with the said officers to the Tony Geisler place and showed them just how I had killed Tony Geisler and his wife. That I had planned on going to North Dakota that evening with the car and go to Ashley.''

Early in the morning the day after the Geislers were murdered and their bodies deposited in the river, their corpses were discovered floating, removed and identified. The bodies were then found to be horribly mutilated by gunshot wounds, evidence concerning which was received. During the course of the trial, testimony was admitted regarding the appearance of the clothing upon the bodies of both Mr. and Mrs. Geisler, and a photograph of their remains was received in evidence. With respect to the evidence offered and admitted concerning the murder of Mr. Geisler, objected to by the defendant, the county attorney stated to the court: ''This evidence is not introduced for the purpose of prosecuting the defendant for anything done to Tony Geisler, but it is included in the same transaction and is introduced for the purpose of showing motive, * * * and that is all. I believe the court will be called upon to instruct the jury with reference to that testimony. It is to show the general plan of the whole transaction.'' And at a later point in the trial, upon objection being made by counsel for the defendant to the admission of testimony respecting the condition of the body of Tony Geisler when found, the county attorney stated: ''I wish to state at this time in the presence of the jury, so that they will absolutely understand, * * * that the only purpose of introducing any evidence in this case about the

death of Tony Geisler is for the purpose of showing motive
and intent; that is all, and in this case we have a perfect
right under the law to show anything that might indicate a
criminal intent or motive, * * * and that would be the
only purpose of that evidence. We do not want to preju-
dice the jury at all, and do not intend to do so by introduc-
ing such testimony." However, in charging the jury, the
court did not give any instruction explaining the purpose of
limiting the scope of such testimony, nor was it requested so
to do by defendant's counsel.

In his testimony as a witness in his own defense, the de-
fendant confirmed his written confession, but displayed con-
siderable ignorance and was somewhat incoherent in his state-
ments; but there was no request or suggestion made by his
counsel or anyone else that an inquiry should be made into
his sanity before proceeding further with the trial. There
was some evidence in defense bearing on the defendant's de-
gree of intelligence, but there was no evidence offered or re-
ceived showing or tending to show that he was insane at any
time. However, without objection, the court instructed the
jury as to that which constitutes insanity and criminal re-
sponsibility, and in this connection it was further instructed
as follows: "If from all the evidence in the case you believe
beyond a reasonable doubt that the defendant committed the
crime of which he is accused in manner and form as charged
in the information, and that at the time of the commission of
such crime the defendant knew that it was wrong to commit
such crime, and was mentally capable of choosing either to do
or not to do the act or acts constituting such a crime, and of
governing his conduct in accordance with such choice, then it
is your duty under the law to find him guilty, even though you
should believe from the evidence that at the time of the com-
mission of the crime he was not entirely or perfectly sane."
And again: "You are instructed that, in order to be criminally
responsible, a person must have intelligence and capacity to
have criminal intent and purpose, and if his mental powers

are so deficient that he has no will, or no conscience; or no controlling mental power, or if, from the overwhelming violence of mental disease, his intellectual power is, for the time, obliterated, he is not criminally responsible; the question to be determined being whether, at the time of the act, he had the mental capacity to entertain a criminal intent, and whether in point of fact he did entertain it."

1 and 2. Questions 1 and 2 are so immediately associated [1] that they will be considered and disposed of together.

By our statute it is provided that where an act forms a part of a transaction, "which is itself the fact in dispute, or evidence of that fact," such act "is evidence as part of the transaction." (Sec. 10511, Rev. Codes 1921.) Under the rule thus stated, evidence respecting the murder of Tony Geisler, the condition of the body and clothing worn by him, was admissible without limitation equally with like testimony respecting Mrs. Geisler, for whose murder the defendant was on trial. Such testimony clearly constitutes a part of the *res gestae*. When two or more offenses are part of the same transaction, every element of the defendant's conduct in the transaction may be shown for the purpose of illustrating the motive or intent in committing the act constituting the basis of the charge. Upon a charge of assault or murder of one person, evidence of an assault upon or murder of another in the same affray is admissible. (8 Cal. Jur. 72.)

"*Res gestae* are the circumstances, facts and declarations [2] which grow out of the main fact, are contemporaneous with it, and serve to illustrate its character." (*State* v. *Broadwater*, 75 Mont. 350, 243 Pac. 587.)

Where the particular facts of a case tend to establish an element of the offense for which the defendant is on trial, they may be proved, and are none the less relevant because they may prove or tend to prove the commission of an independent offense by the defendant. (*State* v. *Geddes*, 22 Mont. 68, 55 Pac. 919; *State* v. *Hopkins*, 68 Mont. 504, 219 Pac. 1106.) Generally, such evidence is admissible in proof of identity,

motive, intent or of a system employed. (*State* v. *Newman*, 34 Mont. 434, 87 Pac. 462; *State* v. *Hill*, 46 Mont. 24, 126 Pac. 41; *State* v. *Wyman*, 56 Mont. 600, 186 Pac. 1; *State* v. *Pippi*, 59 Mont. 116, 195 Pac. 556.) And it is the universal rule that [3] where two persons are killed at the same time and place, and as a part of the same event, or approximately so, evidence as to the circumstances of the killing of one is admissible on the trial of a person informed against for the killing of the other. (*People* v. *Smith*, 106 Cal. 74, 39 Pac. 40; *Hickam* v. *People*, 137 Ill. 75, 27 N. E. 88; *People* v. *Pallister*, 138 N. Y. 601, 33 N. E. 741; *Wilkerson* v. *State*, 31 Tex. Cr. Rep. 86, 19 S. W. 903; *State* v. *Craemer*, 12 Wash. 217, 40 Pac. 944; Under-hill on Criminal Evidence, 2d ed., secs. 88–321; 10 R. C. L. 982.)

In this case the defendant did not request the court to [4] specially instruct the jury as to the purpose for which the evidence respecting the murder of Tony Geisler was ad-mitted, and therefore he will not now be heard to complain of the court's failure to particularly instruct the jury with respect thereto or to limit the effect of such evidence. (*State* v. *Reed*, 65 Mont. 51, 210 Pac. 756.) No error was committed in the admission of such evidence. It was wholly competent as bear-ing directly upon the crime with which the defendant was charged; and no duty devolved upon the court of its own voli-tion, or otherwise, to limit the effect of such testimony by instruction to the jury. The county attorney was most con-siderate of the rights of the defendant in his statements made to the court in the presence of the jury as to the purpose of such evidence. It tended directly to prove facts bearing upon the commission of the crime charged, and there was no occasion to limit the same in effect.

3 and 4. The third and fourth questions relate to the de-[5] fendant's sanity. They will be considered together. Section 12214 of the Revised Codes provides: "When an action is called for trial, or at any time during the trial, or when the defendant is brought up for judgment on conviction, if a doubt arises as to the sanity of the defendant, the court must order

the question as to his sanity to be submitted to a jury, which must be drawn and selected as in other cases; and the trial or the pronouncing of the judgment must be suspended until the question is determined by their verdict, and the trial jury may be discharged or retained, according to the discretion of the court, during the pendency of the issue of insanity."

The record does not anywhere disclose that suggestion was ever made to the court by anyone that the defendant was during the trial or any other time of unsound mind. It was not attempted to be proven in his defense, yet the court went out of its way, by its instructions, to afford protection to the defendant in the event of any question existing in the minds of the jury with regard to his sanity. Of this the defendant cannot and does not complain, as such instructions given were most favorable to him. Under the statute, whether a jury should be called to inquire into the defendant's sanity addresses itself to the sound discretion of the court. (*State* v. *Peterson,* 24 Mont. 81, 60 Pac. 809; *State* v. *Howard,* 30 Mont. 518, 77 Pac. 50; *State* v. *Vettere,* 77 Mont. 66, 249 Pac. 666.) Here there is nothing upon which to predicate an abuse of discretion by the court. There is in fact nothing whatsoever in the record upon which to justify such an inquiry.

This brings us to a consideration of the fourth and last [6, 7] question. In his assignments of error, upon which we base this question, the defendant complains that "the court erred in excluding the testimony of witnesses that the defendant was insane, and, particularly: (a) The court erred in excluding the testimony of defendant's mother to that effect. (b) The court erred in excluding the testimony of the witness Bond, who gave defendant an intelligence test, to the effect that the defendant was not sane, but had the mental capacity of a child of few years." The defendant's counsel have not favored us with record references; however, we have carefully read the entire record, and studied all of the testimony given by each of these witnesses, and there is nothing in fact whatsoever upon which to predicate this assignment of error.

Christina Schlaps, the mother of the defendant, testified that the defendant was severely ill when he was six years of age, and that she then took care of him; that he did not talk as much as the other children; that when he was about ten years old he was sick with the flu, and his nose bled; that in the summer of 1925 he fell from a horse and hurt his chest and broke his arm; that on one or two occasions in the month of March, 1926, he complained of having a headache, and that he did not learn his catechism as fast as the other children. The only possible question to be found in the record upon which to base this complaint is the following one propounded to the witness: "What, from your observation, was the condition of the defendant's mentality as to being bright or stupid?" Objection to this question was sustained by the court, and properly so. The question did not call for an expression of opinion as to the defendant's sanity, and whether in the opinion of the witness he was bright or stupid was wholly immaterial. (*Goosby v. State*, 153 Ga. 496, 112 S. E. 467.)

Dorothy Bond, a school teacher, twenty-two years of age, was permitted to testify to having visited the defendant at the county jail in Wolf Point, about May 22, 1926, at which time she subjected him to the mental test prescribed by Bennett and Simons, in a treatise published by them. She narrated several questions propounded by her to the defendant and his replies thereto as she recalled them. She had seen the defendant but once before, and knew nothing of him, save what she had been told, and the knowledge she acquired from his replies made to her questions. She was never asked to express an opinion as to the defendant's sanity. Objection was sustained by the court to a question asked of her as follows: "Now, have you formed an opinion based upon the experience you have had by giving these other tests or asking the same questions of various children as you have testified to, and by asking the same questions of the defendant here as testified to and based upon your experience of observation of teaching and grading these pupils in your school, as to what the mental age of the defendant was on

May 22, 1926; or, in other words, at what age would a normal, intelligent child have a mentality or understanding equal to that of the defendant?" This is the only possible question upon which the defendant can rely in support of this assignment of error, and that it does not sustain the assignment is manifest. Objection to the question was properly sustained by the court. Her opinion expressed in response to the question would be wholly immaterial. He was capable of committing the crime charged unless shown to be insane. (Sec. 10729, Rev. Codes 1921.) Low mentality would neither excuse nor justify his offense. The defendant was a witness in his own behalf, and the jury were thus afforded opportunity to observe his apparent degree of intelligence. It heard his incoherent and meaningless replies to questions asked, and needed no assistance, if any were required, in gauging his mental capacity. And even though a proper question had been propounded to the witness Bond, as to whether the defendant was sane or insane, she was not competent to express an opinion on the subject at all. (Sec. 10531, Rev. Codes 1921; *State* v. *Penna,* 35 Mont. 535, 90 Pac. 787; *State* v. *Leakey,* 44 Mont. 354, 120 Pac. 234.)

Protection is always afforded in courts of law to persons of **[8]** unsound mind. Distinction is made between sanity and insanity in people, but not as respects their grade of intelligence. The law does not attempt to measure degrees of intellect nor to make distinction with respect thereto, where the power of thought and reason exists. (*Emerick* v. *Emerick,* 83 Iowa, 411, 13 L. R. A. 757, 49 N. W. 1017; *Somers* v. *Pumphrey,* 24 Ind. 231; *Davren* v. *White,* 42 N. J. Eq. 569, 7 Atl. 682; 1 Parsons on Contracts, 9th ed., p. 449.)

Having considered all of the defendant's assignments of error, and finding no merit in any of them, the judgment is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MYERS, STARK and MATTHEWS concur.